UNITED STATES of America,
Plaintiff–Appellee,

v.

Rafael PORTELA, Defendant–Appellant.

United States of America,
Plaintiff–Appellee,

v.

Francisco Villamán–Rodríguez,
Defendant–Appellant.

United States of America,
Plaintiff–Appellee,

v.

Juan A. Carrasquillo, Defendant–
Appellant.

Nos. 97–2353, 97–2354 and 97–2355.

United States Court of Appeals,
First Circuit.

Feb. 9, 1999.

Rehearing and Suggestion for Rehearing
En Banc Denied March 22, 1999.

Lydia Lizarribar–Masini, by appointment of the Court, for appellant Portela, Ramón L. Garay–Medina for appellant Villamán–Rodríguez, and Teodoro Méndez–Lebrón for appellant Carrasquillo.

Stephen Muldrow for appellee United States of America, with whom Guillermo Gil, United States Attorney, José A. Quiles–Espinosa, Senior Litigation Counsel, and Camille Vélez–Rivé and Nelson Pérez–Sosa, Assistant United States Attorneys, were on briefs for appellee.

Before SELYA, BOUDIN and LIPEZ, Circuit Judges.

LIPEZ, Circuit Judge.

Rafael Portela, Francisco Villamán–Rodríguez and Juan Antonio Carrasquillo were each convicted by a jury, after a joint trial with one other co-defendant, of conspiracy to possess multiple kilograms of cocaine with intent to distribute, and specific instances of cocaine possession with intent to distribute, most such instances occurring in the course of the larger conspiracy. On appeal each defendant claims that the indictment alleged a single conspiracy, but the facts adduced at trial proved the existence of multiple conspir-

acies, and that they were thereby wrongly convicted on the overarching conspiracy count. In addition, Villamán–Rodríguez and Carrasquillo both object to the use of alleged hearsay testimony against them at trial. Villamán–Rodríguez objects to the exclusion of alibi evidence in his case, and to the government's alleged withholding of other evidence he claims is in its possession. Portela objects to the district court's charge to the jury, and advances objections to his sentencing. Finding the evidence sufficient to sustain the single-conspiracy convictions and finding no other errors, we affirm.

## Factual background

The indictment in this case alleged that seventeen named conspirators were involved in a series of cocaine transactions dating from November 1993 through July 1996 in which cocaine was purchased in Puerto Rico and transported to the mainland using a variety of methods. The government's case relied primarily on the testimony of Luis Chévere, a central figure in every drug transaction described below, who, after being arrested in May 1995 in connection with an attempted purchase of ten kilograms of cocaine, cooperated in a subsequent sting operation and testified as a government witness. "We recite the facts in the light most favorable to the verdicts being appealed." *United States v. Shifman,* 124 F.3d 31, 33 (1st Cir. 1997), *cert. denied,* — U.S. —, 118 S.Ct. 1053, 140 L.Ed.2d 116 (1998).

### 1. Transactions prior to Chévere's arrest and decision to cooperate with the government

The indictment's conspiracy count includes within its scope several purchases of cocaine by Chévere in which there was no direct involvement by any of the defendants in this appeal. We describe these transactions briefly (interwoven chronologically with transactions involving the defendant-appellants) in order to convey a sense of the scope and nature of the conspiracy as a whole.

In November 1993, Chévere, in cooperation with several drug distributors (Carlos, Joel and Samuel Rivera–Maldonado) in Rochester, New York, traveled to Puerto Rico and purchased a kilogram of cocaine from a supplier known to them only as "Luis." Chévere managed to smuggle this cocaine onto his return flight to Rochester in his check-in baggage, after swapping an inspection sticker from a contraband-free bag onto the bag with the cocaine in it. The cocaine was sold through Carlos Rivera–Maldonado; the proceeds were saved for future purchases.

In December 1993, Chévere again traveled to Puerto Rico, along with Samuel Rivera–Maldonado, and purchased another kilogram of cocaine, this time from one Alex Cruz–Rojas. This cocaine was sent via Express Mail to Rochester where Carlos Rivera–Maldonado sold it. Again, the proceeds were reserved for future purchases.

In April 1994, Chévere traveled to Puerto Rico with his former sister-in-law with the intent of executing a cocaine transaction to raise money for her financially-troubled boyfriend. They purchased three kilograms of cocaine from Alex Cruz–Rojas and mailed them to the boyfriend in Rochester, where the boyfriend sold them. Chévere kept the profits from the sale of one of the three kilograms.

### September 1994: defendant Carrasquillo's transaction

Sometime around September 1994, Cruz–Rojas called Chévere and asked to meet him in Boston. In Boston, Cruz–Rojas and Reynaldo Maysonet (an unindicted co-conspirator) asked Chévere to travel to Puerto Rico and purchase two kilograms of cocaine from a man whom they referred to as "Don Tony" for $19,000 in cash which they would provide. Chévere questioned the amount as too low a price for two kilograms, but was reassured that Don Tony owed Cruz–Rojas and Maysonet money in relation to some prior jewelry transactions and planned to discharge his indebtedness to them by providing them with cocaine. Chévere took Don Tony's phone number from Cruz–Rojas and recorded it in his phone book.

The following morning Chévere traveled to Puerto Rico. Several days later, Juan Antonio (Tony or Don Tony) Carrasquillo came to

Chévere's hotel room during the evening, picked up the cash and, later that night, returned to deliver two kilograms of cocaine. Chévere took the two kilograms with him on his return flight to Rochester, using the same inspection-sticker swap technique he had used in November 1993. In Rochester he delivered the cocaine to Cruz–Rojas and Maysonet.

At trial, Chévere described this transaction. He related his conversations with Cruz–Rojas and Maysonet, during which they described prospectively Don Tony's role in the transaction. There was also corroborating evidence in the form of phone records of a call made by Carrasquillo to either Cruz–Rojas or Maysonet in Boston, and an entry in Chévere's phone book, which was seized upon his arrest, listing Carrasquillo's business, beeper and cell phone numbers.

In late October 1994, Chévere returned to Puerto Rico and purchased another kilogram of cocaine from yet another supplier, William Santiago–Colón. Chévere attempted to send the cocaine to Rochester by Express Mail, but it was apparently intercepted by law enforcement before its arrival.

In March 1995, Chévere again traveled to Puerto Rico, where Santiago–Colón introduced him to "Don Pedro" Rodríguez, who sold Chévere a kilogram of cocaine. Chévere took the cocaine back to Rochester with him, and sold it there. Part of the funds used by Chévere to make the initial purchase was provided by an associate of Cruz–Rojas, and the proceeds of the sale were reserved for future purchases.

### April 1995: defendant Villamán–Rodríguez's transaction

In early April 1995, Chévere and his friend and fellow narcotics trafficker Roselio "Julio" Avila contacted Don Pedro, who said he had a friend who could supply them with four kilograms of cocaine. Chévere traveled to Puerto Rico and met Don Pedro at a bar owned by the latter. A man whom Don Pedro identified as "Chico" arrived in a red Chevrolet Camaro. Don Pedro explained that Chico was to procure the four kilograms of cocaine. Chico left the bar with Don Pedro, and Don Pedro later returned to the bar on foot. Chico returned to the bar in Don Pedro's car, but did not reenter, speaking from the car to Don Pedro out on the street. Don Pedro returned with instructions for Chévere to walk to Don Pedro's nearby apartment with Don Pedro's henchman, where the cocaine was actually delivered. This cocaine was sent to Rochester via the mails, but was interdicted by law enforcement before it arrived.

At trial, Chévere identified Francisco Villamán–Rodríguez in open court as the "Chico" in question. There was a stipulation that Villamán–Rodríguez owned a red Camaro at the time of the transaction. Significant sections of Chévere's testimony were accounts of what Don Pedro told him about Chico's role in the transaction. "Chico" was an acknowledged nickname of Villamán–Rodríguez, and Chévere knew this "Chico" as a Dominican, which is in fact Villamán–Rodríguez's nationality. Finally, there was testimony from a police officer who had interviewed Villamán–Rodríguez, indicating that Villamán–Rodríguez admitted he knew Don Pedro.

### April 1995: defendant Portela's first transaction

Having never received the four kilograms purchased from "Chico," Chévere and Avila again traveled to Puerto Rico in April 1995. Chévere purchased a single kilogram from José Arizaga. Unhappy with the quality of this cocaine, Chévere resold it in Puerto Rico. Avila then acquired another kilogram from a supplier known only as "Freddy," but Avila expressed reservations about sending the cocaine back to Rochester via the mails since the last such shipment had not arrived.

Defendant Rafael Portela, a baggage handler for U.S. Air, had at some point in the past inquired whether Chévere wanted his help in moving drugs through the airport. Even before hearing Avila's misgivings about mailing the cocaine back to Rochester, Chévere, uncertain about the security of his inspection-sticker swap technique, had already decided to contact Portela again and solicit his assistance. After negotiating terms of payment, Portela helped successfully to move

a bag containing one kilogram of cocaine past airport baggage security and onto a flight back to the mainland.

The evidence of this transaction advanced at trial consisted exclusively of Chévere's testimony.

### 2. May 1995: Chévere's arrest

In May 1995, Chévere and several other co-conspirators named in the indictment (including Arizaga, Santiago–Colón, Samuel Rivera–Maldonado, and Victor Roldán–Flores) agreed to purchase ten kilograms of cocaine from a supplier who was in fact an undercover Drug Enforcement Administration agent. On May 12, 1995, Chévere and the others were arrested at the site where the transaction had been scheduled to take place. After his release on bail, Chévere decided to cooperate with the government.

### 3. The sting operation after Chévere's arrest and decision to cooperate with the government, July 1996: defendant Portela's second transaction

The second incident of cocaine trafficking involving Portela took place after Chévere's arrest and decision to cooperate with the government, and involved a reverse-sting operation. In July 1996, Chévere arranged to have Portela place a bag containing four kilograms of simulated cocaine on board a flight without the bag being exposed to law enforcement scrutiny. Portela was arrested after payment for the 1996 transaction was made to an intermediary on his behalf.

At trial, there was surveillance video and audio tape evidence documenting the meeting at which the agreement was made, and the actual passing of the bag at the airport luggage counter. The jury also heard testimony describing the transaction from Chévere and the intermediary, Raúl Rosario, a co-defendant who signed an agreement to cooperate with the government.

The indictment returned by the grand jury charged a single conspiracy among seventeen named persons and others unnamed under Count One, which listed all the transactions described above as overt acts in furtherance of that conspiracy. The indictment also in-cluded fourteen additional counts, each relating to single transactions as described above, charging the participants in each individual transaction with the substantive offense of cocaine possession with intent to distribute. The jury convicted all three defendant-appellants here of all counts against them.

### Discussion

### 1. Conspiracy

Defendant-appellants argue that the evidence was insufficient to allow the jury to find a single conspiracy as charged in Count One, and that the evidence showed instead multiple conspiracies. Thus, they argue, a variance existed between the evidence presented at trial and the charge, and reversal is warranted. Their multiple-conspiracy claims fall into two categories.

First, defendant-appellants argue that the series of transactions between November 1993 and May 1995 were separate and unrelated transactions. They point out that, during the period prior to his arrest, Chévere conducted transactions sporadically on a more or less ad hoc basis, using different suppliers and varying his methods for transporting the cocaine back to Rochester, New York as it was convenient for him. The appellants claim that they were involved only in isolated incidents within this irregular pattern, rather than in a grand criminal scheme that could be characterized as a single conspiracy. In their view, treating this unsystematic succession of acts as a single conspiracy constituted a variance which unfairly prejudiced the jury against them individually because of spillover of evidence produced against fellow conspiracy co-defendants.

Second, the appellants argue that the evidence showed that the sting-operation transaction with Portela in 1996 was not part of the single conspiracy. Although the court agreed that the evidence established that the conspiracy ended upon Chévere's arrest in May 1995, surveillance evidence from the 1996 sting operation against defendant Portela was presented to the jury but excluded by jury instructions from consideration on the conspiracy count. Carrasquillo and Villa-

mán–Rodríguez[1] complain that this variance in the duration of the conspiracy prejudiced them because the tangible, "hard" surveillance evidence from the sting operation, relevant only to Portela's actions outside of the conspiracy, spilled over into their cases despite the jury instructions. They claim this "spillover" unfairly enhanced the credibility of the weaker evidence produced against them, which consisted primarily of the testimony of Chévere, an acknowledged criminal whose word might not be credible without such tangible corroboration.

### (a). The single conspiracy prior to Chévere's arrest

The " 'essence' of conspiracy is an agreement to commit a crime...." *United States v. Moran*, 984 F.2d 1299, 1300 (1st Cir.1993) (citing *Iannelli v. United States*, 420 U.S. 770, 777, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975)). The indictment in this case alleges an agreement among the appellants, their fourteen co-defendants, and others known and unknown to possess multiple kilograms of cocaine with intent to distribute. The law is clear that a tacit agreement is sufficient. *See United States v. Glenn*, 828 F.2d 855, 857 (1st Cir.1987) ("A defendant drug distributor may expressly agree with his immediate supplier that he will sell any drugs provided to him, but he may tacitly agree with a more distant supplier, say a smuggler, that each will work for the success of the whole drug operation."). To determine if the evidence supports finding a single conspiracy (that is to say, a single general agreement), courts have looked for (1) a common goal, (2) interdependence among the participants,[2] and (3) overlap among the participants. *See United States v. Gaviria*, 116 F.3d 1498, 1533 (D.C.Cir.1997), *cert. denied*, — U.S. ——, 118 S.Ct. 1086, 140 L.Ed.2d 143 (1998).

"The goal of selling cocaine for profit" satisfies the common goal requirement.[3] *United States v. Wilson*, 116 F.3d 1066, 1075 (5th Cir.1997).[4] That each defendant had an interest in furthering the distribution of cocaine is also sufficient evidence that they shared a common goal with the other participants. *See Gaviria*, 116 F.3d at 1533; *United States v. Maceo*, 947 F.2d 1191, 1196 (5th Cir.1991).

Establishing "interdependence" among the participants requires determining "whether the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme." *Wilson*, 116 F.3d at 1076. Each individual must think the aspects of the venture interdependent, and each defendant's state of mind, and not his mere participation in some branch of the venture, is key. *See Glenn*, 828 F.2d at 857–59. "[K]nown interdependence ... makes it reasonable to speak of a tacit understanding between the distributor and others upon whose unlawful acts the distributor knows his own success likely depends." *Id.* at 857–58. Put another way, evidence of an individual participant's understanding of the interdependence of the co-conspirators' activities is evidence—often the best evidence—of tacit agreement between the individual and his co-conspirators.

The "overlap" requirement can be satisfied by the pervasive involvement of a single "core conspirator," a hub character like Chévere. *Wilson*, 116 F.3d at 1076; *Gaviria*, 116 F.3d at 1533. "[I]n a unitary

---

1. Portela's different argument complaining of the exclusion of the sting operation from the scope of the conspiracy is also addressed in part (b), below.

2. The analysis we use to determine "interdependence" is often characterized in the caselaw as an analysis of "the nature of the scheme," but there is no conceptual difference between the tests. *See United States v. Wilson*, 116 F.3d 1066, 1075–76 (5th Cir.1997) (*Wilson* was reversed in part on other grounds; *see infra* note 4); *United States v. Richerson*, 833 F.2d 1147, 1153–54 (5th Cir.1987).

3. The common goal requirement has generally been broadly drawn by the Courts of Appeals: "Given these broad 'common goals' the common objective test may have become a mere *matter of semantics." Richerson*, 833 F.2d at 1153.

4. *Wilson* was reversed in part (as to the firearms conviction of one of the numerous defendants) by the Fifth Circuit sitting en banc. *See United States v. Brown*, 161 F.3d 256 (5th Cir.1998) (en banc).

conspiracy it is not necessary that the membership remain static ... or that a given member knows all his fellow coconspirators." *United States v. Sepulveda,* 15 F.3d 1161, 1191 (1st Cir.1993) (citations omitted). "The fact that every defendant did not participate in every transaction necessary to fulfill the aim of their agreement does not transform a continuing plan into multiple conspiracies." *United States v. Drougas,* 748 F.2d 8, 17 (1st Cir.1984).

■ "The question whether a given body of evidence is indicative of a single conspiracy, multiple conspiracies, or no conspiracy at all is ordinarily a matter of fact; a jury's determination in that regard is subject to review only for evidentiary sufficiency." *United States v. Wihbey,* 75 F.3d 761, 774 (1st Cir.1996). Ultimately, while the analysis of "common goals," "interdependence," and "overlap" is useful for resolving challenges to the sufficiency of the evidence on appeal, this court has looked beyond any such lists of factors to "the totality of the evidence" in determining whether there is factual support for a finding of a single conspiracy. *Drougas,* 748 F.2d at 17. On appeal, we apply the foregoing legal standards to the facts, construing the evidence and reasonable inferences therefrom in the light most favorable to the verdict to determine if a rational jury could have found beyond a reasonable doubt that each defendant joined a single conspiracy. *See United States v. Alicea–Cardoza,* 132 F.3d 1, 5 (1st Cir.1997).

We turn to the facts of each defendant's case to see whether they support a finding of a single conspiracy, multiple conspiracies, or no conspiracy for the period November 1993 to May 1995.

### (i) Carrasquillo

■ Carrasquillo relies heavily on *United States v. Moran,* 984 F.2d 1299, 1302 (1st Cir.1993), as support for the proposition that his participation in a single transaction should be per se insufficient to support his agreement to join the entire conspiracy stretching from November 1993 to May 1995. However, the existence of a conspiratorial agreement is an issue of fact, and here there was evidence beyond the single sale itself to indicate that Carrasquillo was entangled in the larger web. While *Moran* states that "an unplanned spot sale with no agreement beyond that inherent in the sale" may not implicate the special concerns underlying the separate criminalization of conspiracy, where there is an "agreement ... to make a sale at a future point," those concerns are implicated:

> A multiplicity of actors united to accomplish the same crime is deemed to present a special set of dangers, either that the criminal end will be achieved, *Callanan v. United States,* 364 U.S. 587, 593, 81 S.Ct. 321, 5 L.Ed.2d 312 (1961), or that the conspiracy will carry over to new crimes, *United States v. Rabinowich,* 238 U.S. 78, 88, 35 S.Ct. 682, 59 L.Ed. 1211 (1915), or both. *See* 2 W. LaFave & A. Scott, *Substantive Criminal Law* § 6.4(c) (1986) (summarizing the rationale). It is these dangers ... that justify early intervention to stem conspiracies even before they rise to the level of attempts and to impose a separate punishment on the conspirators even if they fail to achieve their ends. This special set of dangers is present if two individuals agree that one of them will sell cocaine and the other will assist; it is arguably not present if one merely sells the same cocaine to another without prearrangement and with no idea of or interest in its intended use.

984 F.2d at 1302–03. Here there was substantial evidence that Carrasquillo had prearranged to sell cocaine to Cruz–Rojas and Maysonet through Chévere as an intermediary, and that he had an interest in the ultimate profitable outcome of the sale of the drugs in Rochester since his motive for engaging in the transaction was to discharge a debt to Cruz–Rojas and Maysonet.

This evidence was sufficient to support Carrasquillo's accession to at least the smaller conspiracy to execute his sale, involving an agreement between Carrasquillo, Chévere, and the ultimate distributors (Cruz–Rojas and Maysonet) of the two kilograms Carrasquillo sold. Carrasquillo, however, was convicted of a broader conspiracy which encompassed all the other transactions involving Chévere, Chévere's distributors,

and Chévere's various suppliers between November 1993 and May 1995. Carrasquillo objects that the other transactions involved suppliers who were not personally known to him, and thus he could not have tacitly agreed with them to sell to Chévere's distribution network. Carrasquillo's objection thus requires us to consider whether, in a case involving transactions between a single middleman's organization and various individual suppliers who do not specifically know each other, there exists a single conspiracy including all the suppliers, or multiple conspiracies limited in scope to the transactions of each individual supplier with the single trafficking and distribution organization.

We note initially that Carrasquillo shared with all the indicted coconspirators the "common goal" of profiting from transactions in cocaine, and that Chévere's involvement in all the transactions supplied the degree of "overlap" of participants necessary to a finding of a single conspiracy. This leaves only the "interdependence" element to be proven.

In *Glenn* we stated that while "known interdependence ... makes it reasonable to speak of a tacit understanding" between conspirators, "where [a defendant drug] distributor is indifferent to the purposes of others in the enterprise—say, other distributors— the tacit understanding [necessary to finding a single conspiracy encompassing all distributors] does not exist." 828 F.2d at 857–58. As authority for this point we cited *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (finding a "hub-and-spoke" enterprise to comprise multiple conspiracies) and *United States v. Borelli*, 336 F.2d 376, 383 n. 2 (2d Cir.1964) (finding numerous sellers and purchasers at either end of a "chain" narcotics conspiracy could not each be inferred to have entered into a single conspiracy involving all sellers and purchasers). However, as *Borelli* itself indicates, one conspiracy can be found if "the

evidence permitted the inference that each group of retailers must have known the operation to be so large as to require the other as an outlet." *Id.* In cases involving transactions between a single drug trafficking organization and multiple drug suppliers, other circuits have found a single conspiracy if the continued health of the trafficking and distribution network necessarily depends on the continued efforts of multiple suppliers. *See United States v. Morris*, 46 F.3d 410, 416 (5th Cir.1995) (competing multiple suppliers nonetheless part of a common plan; purchases other than from one regular supplier may be necessary to keep a larger common plan in existence); *United States v. Harrison*, 942 F.2d 751, 756–57 (10th Cir.1991) (multiple suppliers in competition with each other may be part of one conspiracy so long as they have not worked towards and succeeded in the total exclusion of the other suppliers).

In the instant case, there was sufficient evidence for the jury to conclude that Carrasquillo understood that his transaction's success depended on the health of the trafficking and distribution network focused around Chévere, which in turn depended on continued transactions between Chévere and other suppliers. Although these other suppliers were perhaps unknown individually to Carrasquillo, the jury could have reasonably inferred that he must have been aware of their existence. The success of Carrasquillo's transaction was dependent on Chévere, Cruz–Rojas and Maysonet being part of a conspiratorial network capable of disposing profitably of the large wholesale quantity of powder cocaine that Carrasquillo sold to them, and the very existence of such a network was necessarily dependent on the existence of other wholesale suppliers.[5] Carrasquillo thus could not have been "indifferent" to the rest of the suppliers, in the sense we described in *Glenn*,[6] since the work of other

---

**5.** In a recent case upholding a broad conspiracy conviction of a supplier who knew the woman to whom he sold two kilograms of cocaine, but did not know specifically of her six associates, the Second Circuit made a similar inference based on drug quantity: "[W]here advanced plans are made regarding the sale of narcotics in wholesale quantities, the participants in the transaction

may be presumed to know that they are part of a broader conspiracy." *United States v. Harris*, 8 F.3d 943, 946 (2d Cir.1993) (citation and quotation marks omitted).

**6.** We note that in *Glenn* the defendant whose conviction was reversed was more than "indifferent" to the scheme held to be outside of the

suppliers was essential to the health of Chévere's network, and thus also to the ultimate success of Carrasquillo's transaction. The evidence against Carrasquillo was thus sufficient to have led a reasonable jury to conclude that he was a party to a tacit agreement relating to Chévere's entire continuing enterprise, despite the fact that there was only a single transaction between them.

### (ii) Villamán–Rodríguez

 There was adequate evidence supporting the conclusion that Villamán–Rodríguez was part of a conspiracy to execute the single sale in April 1995: [7] Chévere and Avila contacted Don Pedro asking if he knew a supplier who could provide four kilograms of cocaine; after a time Don Pedro indicated that he had a friend who could supply such an amount; on the night of the sale, that friend was revealed to be Villamán–Rodríguez. The fact that the sale had been prearranged in this manner demonstrated the degree of preplanning on Villamán–Rodríguez's part requisite for a jury to find he conspired with Chévere and others to execute this single sale.

However, like Carrasquillo, Villamán–Rodríguez argues that the facts do not support his participation in the broader conspiracy of which he was convicted, whose scope extended to the transactions of other suppliers with Chévere between November 1993 and May 1995. We disagree. Villamán–Rodríguez clearly shared the "common goal" of profiting from cocaine transactions with the other co-conspirators, and Chévere's involvement provided the requisite degree of participant "overlap" with the rest of the scheme. As to "interdependence," applying the same reasoning we applied to Carrasquillo's claims, we conclude that the nature of Villamán–Rodríguez's transaction with Chévere was such that a reasonable jury could have inferred that he understood the scope of the broader conspiracy and the fact that other suppliers would necessarily have been involved. The amount of cocaine sold by Villamán–Rodríguez, four kilograms, is a wholesale amount, and in conspiring with Chévere (and others) to sell it, Villamán–Rodríguez necessarily must have understood that he was conspiring with individuals whose trafficking and distribution business necessarily had to depend on other suppliers in order to sustain its capability of moving such large quantities of drugs.

### (iii) Portela

 Evidence of Portela's first transaction with Chévere in late April 1995 was sufficient to convict him of participation in the single broad conspiracy. Chévere testified that Portela had come to him with the suggestion that cocaine could be moved through the airport even before Chévere proposed the April 1995 transaction to him. During the meeting at which Chévere actually proposed that Portela help him smuggle a bag past airport security, Chévere disclosed to Portela "the failures we had had concerning the packages that had been sent by mail." Portela's knowledge of these failures, and his earlier initiative in suggesting smuggling through the airport, were sufficient to allow a rational jury to infer an understanding on his part that successfully transporting drugs was essential to the ongoing success of Chévere's whole cocaine trafficking operation from November 1993 to the date of his ar-

scope of the conspiracy he agreed to; he was, rather, actively opposed to it. *See Glenn,* 828 F.2d at 859.

7. We note here that the evidence recounted above was also sufficient to convict Villamán–Rodríguez of the substantive count of possession with intent to distribute. Villamán–Rodríguez's only specific objection to the sufficiency of the evidence underlying his substantive conviction is his claim that the indictment's substantive count charged him with possession "on or about March 1995," and no evidence was produced relating to March 1995. Instead, all the evidence presented against him related to the actual sale transaction in early April 1995. However, this variance was not prejudicial. The indictment's specification of possession "on or about" March 1995 reasonably encompasses criminal conduct in April 1995. *See United States v. Antonelli,* 439 F.2d 1068, 1070 (1st Cir.1971) (exact time of commission not a substantive element of proof unless statute intended to have such effect); *United States v. Campbell,* 732 F.2d 1017, 1020 (1st Cir.1984) (time of offense not a substantive element of possession with intent to distribute cocaine; no error if sale was within reasonable time of "on or about" date in indictment).

rest. These facts were sufficient evidence of Portela's understanding of the "interdependence" of his acts and those of his coconspirators. Since Portela also clearly shared the "common goal" of profiting from transactions in cocaine, and Chévere's involvement provided the requisite degree of participant "overlap" with the rest of the scheme, there was sufficient evidence to convict Portela on the single conspiracy count.

 Portela also claims that the jury instructions were confusing and/or misleading in that they did not adequately instruct the jurors that they had to acquit on the single conspiracy charge if they found that the evidence showed multiple conspiracies. The main body of the instructions stated as follows:

> If the evidence in this case shows that a defendant was a member of some conspiracy, or that this conspiracy was not the conspiracy charged in Count One of the indictment, you must acquit the defendant of the conspiracy charge. Unless the Government proves the existence of the conspiracy as stated in Count One of the indictment beyond a reasonable doubt, you must acquit the defendants of Count One.

After the judge finished reading the main body of the instructions and took objections, he gave an amended instruction on factors to be considered in distinguishing multiple from single conspiracies:

> [I]t is your function to determine whether there was one or more conspiracies in this case, and I charge you that whether an indictment charges one or more conspiracies with the evidence—I mean, that the evidence charges one or more conspiracy, it must be determined on the totality of the circumstances, and the following factors should be considered: Time; persons acting as co-conspirators; the statutory offenses charged in the indictment; the overt acts charged by the Government or any other description of the offenses charged which indicate the nature and the scope of the activity which the Government seeks to punish in each case; and the places where the events alleged as part of the conspiracy took place.

The essence of the determination is to determine whether there is one agreement to commit two crimes, or more than one agreement, each with a separate object. Portela now objects to the fact that the latter instruction, having mentioned the possibility of finding multiple conspiracies, did not reiterate the directive "you must acquit" if the jury did so find. Because Portela failed to object to these specific instructions after they were given at trial, we review for plain error. *See United States v. Crochiere*, 129 F.3d 233, 237 (1st Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1364, 140 L.Ed.2d 513 (1998). Having scrutinized the instructions in their entirety, we find no basis for the position that they were confusing or misleading when viewed as a whole. The amended instruction merely offered guidance as to what specific factors the jurors could consider in distinguishing a single conspiracy from multiple conspiracies. There is no reason to assume that the amended instruction would have led the jurors to forget the court's earlier admonition that they must acquit if they found a conspiracy or conspiracies different from the single one charged.

We conclude that the evidence supported a finding of a single conspiracy involving all three defendant-appellants for the period prior to Chévere's arrest. Having disposed of the defendant-appellants' claims that there were multiple conspiracies during the period prior to Chévere's arrest, we now address their claims that because the proof at trial showed that the sting operation was not part of this single conspiracy, there was a prejudicial variance between the single conspiracy charged and that proved.

**(b). The variance relating to the sting operation**

 At trial the government intended to offer proof that Portela's actions during the July 1996 sting operation should be considered part of the single conspiracy, despite the fact that Chévere had been arrested in May 1995 and was a government agent by the time of the sting operation. The government had conceded that there could not be "a conspiracy between a government agent and one person," i.e., between Chévere and

Portela in 1996, but anticipated that Raul Rosario's testimony would establish that he had an agreement with Portela relating to the 1996 transaction. Rosario was the intermediary to whom Chévere delivered Portela's payment for the 1996 transaction. When Rosario ultimately testified that he did not know that the money dropped off with him was a payment for drug trafficking, only one person—Portela—remained as a potential conspirator as of July 1996. It is axiomatic that a conspiracy cannot continue without at least two genuine parties to the agreement. *See United States v. Giry*, 818 F.2d 120, 126 (1st Cir.1987).[8] On this reasoning, the trial court determined as a matter of law that Chévere's arrest ended the conspiracy in May 1995, yet the charge contained in the indictment included the July 1996 sting operation transaction as part of the single overarching conspiracy. Therefore, there was a "variance" between the proof offered at trial and the charge contained in the indictment.

■■■■ To be sufficient grounds for reversal, a variance must be severe enough to affect the defendant's substantial rights. *See Glenn*, 828 F.2d at 858. "We review de novo the question whether a variance affected a defendant's substantial rights." *Wihbey*, 75 F.3d at 774. Defendants claim prejudice to their substantial rights from the "spillover" of evidence from the sting operation into the jury's consideration of the conspiracy charge. In a large joint trial, the jury will often see evidence tending to establish the guilt of one defendant but inadmissible against another, or relevant to one count of an indictment but not to another, making it difficult to evaluate objectively the evidence. A "transference of guilt" from one defendant to another or from

one charge to another can take several forms, ranging from jury confusion to a subconscious accumulation of superfluous evidence, "an atmosphere clouding the jury's ability to evaluate fairly" the credibility of other, probative evidence. *United States v. Perkins*, 926 F.2d 1271, 1281 (1st Cir.1991). However, "[t]o prevail on a claim of prejudicial spillover, a defendant must prove prejudice so pervasive that a miscarriage of justice looms." *Wihbey*, 75 F.3d at 776 (citations and quotation marks omitted).

We find that there was no prejudice to any of the defendants' substantial rights arising from the presentation to the jury of evidence from the sting operation. Immediately before the presentation to the jury of the surveillance video and audio tape evidence, the trial court carefully instructed the jury that they could not consider the tapes as evidence against Carrasquillo or Villamán–Rodríguez.[9] After Rosario's testimony established conclusively that the sting operation was not part of the single charged conspiracy, the trial court again carefully instructed the jury, prior or to its deliberations, as follows:

> [THE COURT:] During the trial I charged—I instructed you that the evidence with respect to the Overt Acts Nos. 31, 32, 33, and 34 [the sting operation] may not be considered as to defendants Carrasquillo, Villamán, and Arizaga, and these are charges that charge conduct after May the 12th. It may not be used as to Count One [the conspiracy count] concerning defendants Carrasquillo, Villamán, and Arizaga. They may only be used against defendant—they may not be used at all, I may say.

---

8. "The rule that government agents do not count as co-conspirators has relevance only in situations where the conspiracy involves only one defendant and a government informer. In that situation there can be no conspiracy because it takes two to conspire and the government informer is not a true conspirator." *Giry*, 818 F.2d at 126 (quotation marks omitted). *See also United States v. Escobar de Bright*, 742 F.2d 1196, 1198–1200 (9th Cir.1984).

9. Before the introduction of the audiotape, the judge stated: "I am going to instruct you that the tapes may not be considered as substantive evidence as against co-defendants Antonio Carras-

quillo, Francisco Villamán, Jose Arizaga; that those tapes may not be considered as substantive evidence against these three defendants. Is that clear?" THE JURORS: "Yes." (Arizaga was tried jointly with the three appellants in the instant case; he was the only other conspirator named in the indictment to go to trial.)

Before the introduction of the videotape, the judge stated: "Ladies and Gentlemen of the jury, this evidence that is going to be presented now cannot be considered in connection with the defendants Antonio Carrasquillo, Villamán–Rodríguez, Jose Arizaga."

Now I am instructing you that you may not consider such evidence as to Rafael Portela. In other words, you may not use or consider the evidence in connection with Overt Acts 31, 32, 33, and 34 as to any of the defendants as they pertain to the conspiracy charge in Count One. . . .

Is that clear?

THE JURORS: Yes

THE COURT: You may, however, consider the evidence described in paragraphs 31, 32, 33, and 34 in connection with the substantive [possession] counts Thirteen and Fifteen as to defendant Portela and give that evidence the weight you think it deserves.

In explaining the legal concept of conspiracy to the jurors, the trial court limited the time frame of the single charged conspiracy as follows:

For you to find each defendant—each of the defendants guilty of conspiracy, you must be convinced that the government has proved, with respect to the respective defendants whose guilt or innocence you are considering, each of the following things or factors beyond a reasonable doubt: First, that between on or about November of 1993 and May 12, 1995 [the date of Chévere's arrest], the agreement specified in the indictment, and not some other agreement or agreement [sic], existed between at least two people to possess with intent to distribute cocaine.

And second, that the respective defendants willfully joined in that agreement.

 We presume that jurors will follow clear instructions to disregard evidence "unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant." *Greer v. Miller*, 483 U.S. 756, 766 n. 8, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987) (citations omitted).

The sting operation transaction was distinct in its elements and timing from the other transactions in this case, and therefore the jury would not have had a difficult task in compartmentalizing its consideration of the evidence in accordance with the court's careful limiting instructions. *Cf. United States v. Morrow*, 39 F.3d 1228, 1235–36 (1st Cir.1994) (no prejudice where two conspiracies charged as one, even without limiting instructions, when schemes were distinct). Under the circumstances, we find that the defendants have fallen short of establishing prejudicial spillover sufficient to warrant reversal.

Finally, we address Portela's objections to the court's instruction limiting the consideration of the sting operation overt acts as to the conspiracy count, and to the court's instruction on the elements of conspiracy stating that the conspiracy agreement had to exist "between on or about November of 1993 and May 12, 1995." Portela objected to these instructions because he expected that if the original conspiracy charge, stretching from November 1993 to July 1996 as specified in Count One of the indictment, was submitted to the jury intact he would be acquitted by the jury on the conspiracy count because Chévere's arrest ended the agreement. Portela claims these instructions nullified his multiple conspiracy defense and "constructively and impermissibly amended the indictment." [10]

 A constructive amendment "occurs when the charging terms of the indictment are altered, . . . in effect, by prosecution or court after the grand jury has last passed upon them." *United States v. Paredes–Rodriguez*, 160 F.3d 49, 55 (1st Cir. 1998) (quotation marks omitted; alteration in original). "A constructive amendment is considered prejudicial per se and grounds for reversal of a conviction." *United States v. Fisher*, 3 F.3d 456, 463 (1st Cir.1993).[11] An indictment may be constructively amended

---

10. In the instant case there was no *literal* alteration of the indictment. The indictment submitted to the jury before its deliberations was literally the same as the one returned by the grand jury.

11. In this respect a constructive amendment is distinct from a variance. "A variance occurs

when the charging terms remain unchanged but when the facts proved at trial are different from those alleged in the indictment," and is grounds for reversal only if it is prejudicial to the defendant's "substantial rights." *See Fisher*, 3 F.3d at 462, 463.

by jury instructions which have the effect of broadening the charges in the indictment. *See Stirone v. United States,* 361 U.S. 212, 214–16, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). Neither jury instruction at issue broadened the conspiracy charge; neither constructively amended the indictment. We elaborate.

▬▬▬ We have approved the literal deletion from an indictment of overt acts not supported by the evidence in cases where the underlying offense does not require proof of overt acts. *See United States v. Angiulo,* 847 F.2d 956, 964–65 (1st Cir.1988). Under the narcotics conspiracy statute on which the charges in the instant case are based, 21 U.S.C. § 846, the government need not prove any overt acts in furtherance of the conspiracy. *See United States v. Shabani,* 513 U.S. 10, 11, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994). Here the court did not even go so far as to redact the offending overt acts from the indictment, as in *Angiulo,* but merely instructed the jury not to consider evidence of the overt acts involving the sting operation in relation to the conspiracy count. Since it was within the court's power to delete those overt acts from the indictment literally, there was certainly no error in the instruction limiting consideration of the sting operation overt acts.

▬▬▬ In instructing the jury on the elements of conspiracy, the court properly reinforced the curative instruction regarding the sting operation overt acts by temporally limiting the agreement to events before May 12, 1995. While this limitation effectively altered language in Count One of the indictment itself,[12] and not language in an overt act (making *Angiulo* inapplicable), it narrowed the offense charged rather than broadening it. In *Stirone,* the case establishing that jury instructions can work a constructive amendment, the Supreme Court

stated only that "after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself." 361 U.S. at 215–16, 80 S.Ct. 270. The Court has more recently held that the guarantee of indictment by a grand jury is not violated where a conviction is based on "a significantly narrower and more limited, though included, fraudulent scheme" than that alleged in the indictment. *United States v. Miller,* 471 U.S. 130, 131, 138–45, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985). The instruction limiting the duration of the conspiracy in the instant case similarly limited the conspiracy to a scheme narrower than, though included within, the scheme alleged in the indictment. There was no error in this corrective, limiting instruction.

### 2. Other Trial Issues

#### (a). Admission of co-conspirator statements

Carrasquillo and Villamán–Rodríguez argue that they were convicted on the basis of hearsay evidence improperly admitted under the co-conspirator exception set forth in Federal Rule of Evidence 801(d)(2)(E). Pursuant to that rule, a statement offered against a party is not hearsay if it is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed. R.Evid. 801(d)(2)(E).

▬▬▬ Statements of coconspirators are admissible under Rule 801(d)(2)(E) only if the trial court finds it "more likely than not that the declarant and the defendant were members of a conspiracy ... and that the statement was in furtherance of the conspiracy." *United States v. Petrozziello,* 548 F.2d 20, 23 (1st Cir.1977).[13] Hearsay evidence may be admitted provisionally, subject to the trial court's final *Petrozziello* determination, which should be made "at the close of all the

---

12. Count One states: "From on or about November 1993 ... and continuing thereafter up to and including July 11, 1996, in the District of Puerto Rico [and elsewhere,] the defendants herein[,] did ... conspire ... to possess with intent to distribute [cocaine] in violation of Title 21, United States Code, Section 846." This language is followed in the indictment by a statement of the objectives of the conspiracy and a list of overt acts.

13. The ellipsis replaces the words "when the hearsay statement was made." This restriction was dicta in *Petrozziello,* and the implicit limitation on admissibility was explicitly withdrawn by this court in *United States v. Baines,* 812 F.2d 41, 42 (1st Cir.1987) (affirming admission against appellant of statements of other conspirators made prior to his joining conspiracy).

evidence" and "out of the hearing of the jury." ' *United States v. Ciampaglia,* 628 F.2d 632, 638 (1st Cir.1980). We will sustain the trial court's determination unless it is clearly erroneous. *See Earle v. Benoit,* 850 F.2d 836, 842 (1st Cir.1988). While a trial court may consider the contents of the statements at issue as evidence of the elements of a *Petrozziello* determination, the determination must rest at least in part on corroborating evidence beyond that contained in the statements at issue. "[T]he preponderance of evidence required for the introduction of an out-of-court statement under Rule 801(d)(2)(E) must necessarily comprise more than the weight of the statement itself.... [A] coconspirator's statement, standing alone, is insufficient to meet the preponderance standard of Rule 801(d)(2)(E)." *United States v. Sepulveda,* 15 F.3d 1161, 1181–82 (1st Cir.1993).

The extent of such corroborating evidence required at the time of the trial in this case [14] is an open question. *Sepulveda* explicitly requires only extrinsic proof of the declarant's involvement in the conspiracy. *See id.* at 1182. However, in that case the lack of any extrinsic evidence of the declarant's involvement in the conspiracy was sufficient to render the declarant's statements inadmissible and require reversal; therefore, we never addressed the full extent of the extrinsic evidence requirement. In two earlier cases, *United States v. Rivera–Santiago,* 872 F.2d 1073, 1093 (1st Cir.1989), and *United States v. Gomez–Pabon,* 911 F.2d 847, 856 n. 3 (1st Cir.1990), we recounted extrinsic evidence corroborating each defendant's membership in the conspiracy, without stating that such extrinsic evidence was necessary to support the Rule 801(d)(2)(E) admissions. However, we need not resolve the issue conclusively here since there is adequate extrinsic evidence in each case before us to corroborate the participation in a conspiracy of both the respective declarants and defendants.

**14.** The trial in this case took place before December 1, 1997, the effective date of the 1997 Amendments to Fed.R.Evid. 801. Whereas *Sepulveda* states only that "admitting the statement into evidence requires some extrinsic proof of the *declarant's* involvement in the conspiracy," 15

### (i) Carrasquillo

◼ Carrasquillo objects to the admission of Chévere's testimony that Cruz–Rojas and Maysonet told him that Carrasquillo was going to provide cocaine in discharge of his indebtedness to them. We have already stated that there was sufficient evidence to show Carrasquillo's involvement in a conspiracy with Chévere, Cruz–Rojas, and Maysonet to carry out at least the September 1994 transaction. That same evidence supports the trial court's determination, under *Petrozziello*, that it was more likely than not that Cruz–Rojas and Maysonet, the declarants, were members of that conspiracy and that Cruz–Rojas and Maysonet's statements were in furtherance of that conspiracy.

There was also sufficient independent non-hearsay evidence to support the participation in a conspiracy of the declarants and Carrasquillo. Chévere's in-court identification of Carrasquillo as the person who delivered the cocaine, Carrasquillo's phone records and Chévere's phone book entry containing Carrasquillo's number constitute adequate corroborating evidence, extrinsic to Rule 801(d)(2)(E) admissions, that Carrasquillo was a party to the conspiracy. Chévere's testimony that he witnessed acts in furtherance of the conspiracy by Cruz–Rojas and Maysonet sufficed as evidence, extrinsic to Rule 801(d)(2)(E) admissions, corroborating the existence of the conspiracy and the participation of those declarants. Together this independent evidence was sufficiently corroborative to justify the court's admission of the statements.

### (ii) Villamán–Rodríguez

◼ Villamán–Rodríguez argues that Chévere's extensive accounts of the statements of Don Pedro, deceased at the time of trial, were improperly admitted under Rule 801(d)(2)(E). Again, we have already noted that there was sufficient evidence to implicate Villamán–Rodríguez in a conspiracy with

F.3d at 1182 (emphasis added), the 1997 Amendments extended the extrinsic evidence requirement to also include evidence of "the existence of the conspiracy" and "the participation ... of the party against whom the statement is offered."

Don Pedro and Chévere subsuming at least the early April 1995 transaction. That same evidence supports the trial court's determination, under *Petrozziello,* that it was more likely than not that Don Pedro and Villamán–Rodríguez were members of a conspiracy and that Don Pedro's statements were in furtherance of that conspiracy.

There was also sufficient independent non-hearsay evidence to support the participation in a conspiracy of Don Pedro and Villamán–Rodríguez. Chévere's testimony describing Don Pedro's involvement in "Chico"'s transaction and "Chico"'s presence around Don Pedro's bar at various key junctures before the transaction, Chévere's in-court identification of Villamán–Rodríguez as "Chico," and Chévere's description of "Chico"'s car as matching the stipulated description of Villamán–Rodríguez's car, taken together, constitute sufficient evidence, extrinsic to Rule 801(d)(2)(E) admissions, to corroborate the existence of the conspiracy and the participation therein of the declarant and defendant. There was no error in the admission of statements under Rule 801(d)(2)(E).

### (b). Villamán–Rodríguez's Additional Arguments

#### (i). Exclusion of Villamán–Rodríguez's alibi defense evidence

The court issued a scheduling order containing a deadline for defendants to give notice of intent to offer an alibi defense, which Villamán–Rodríguez did not meet. On the first day of trial he attempted to add a witness and admit documentary evidence establishing an alibi. The court denied his request on the grounds that counsel had not shown good cause for the delay in giving notice of alibi. Villamán–Rodríguez claims that (1) the *government* had not specified the time the acts were supposed to have taken place, burdening the defendant with the need to establish potential alibis for many different dates, (2) the *indictment* was imprecise as to the times given for Villamán–Rodríguez's involvement, leaving Villamán–Rodríguez without any guidance as to what dates he should attempt to establish alibis for, and leading to his belated production of an important alibi document, and (3) preclusion of the evidence was an excessive sanction under the applicable standards as set forth by the Supreme Court in *Taylor v. Illinois,* 484 U.S. 400, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988).

Villamán–Rodríguez expends much effort discussing Fed.R.Crim.P. 12.1, "Notice of Alibi," which treats the situation where the *government* demands notice of the defense's intent to offer an alibi defense. In such a situation the government must disclose time, date, and place information about the alleged offenses with its demand. However, Rule 12.1 is not controlling here. In this case *the court itself* set a deadline for the defense to disclose its intent to offer an alibi defense, which Villamán–Rodríguez did not meet. The court's scheduling order stated that "notices *from defendants* . . . shall comply with the Rules of Criminal Procedure [presumably, Rule 12.1], which means dates, names, etc." (emphasis added), and presumably relied on the indictment to give defendants notice of the time periods at issue.[15]

Villamán–Rodríguez claims the government failed some unspecified duty to augment the specificity of the indictment. The indictment in this case alleged that he possessed cocaine "on or about March 1995" and that he supplied it "on or about April 1995." While he now claims that this period was too broad and imprecise to allow him to investigate possible alibi defenses, he never moved for a bill of particulars under Fed.R.Crim.P. 7(f). Moreover, the indictment's "on or about" temporal specifications were perfectly adequate. *See United States v. Paiva,* 892

---

15. Villamán–Rodríguez does not explicitly raise the question of whether such a scheduling order exceeded the court's general case management authority by eliminating the burden of triggering alibi defense discovery procedures that the prosecutor would otherwise bear under Fed.R.Crim.P. 12.1(a). Even if Villamán–Rodríguez had explicitly made such an argument on appeal, we note that he did not properly preserve such a challenge by raising it before the trial court at any point during the proceedings therein. Therefore, we do not address the issue, except to note that the scheduling order included the requirement of reciprocal government disclosure of alibi rebuttal witnesses which has been held essential to the constitutionality of notice of alibi statutes and rules generally. *See Wardius v. Oregon,* 412 U.S. 470, 472, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973).

F.2d 148, 154–55 (1st Cir.1989) ("early 1983" and "the fall of 1983" adequately specific to allow development of alibi defense).

■■■■■ Preclusion of an alibi defense as a penalty for discovery violations in a criminal case implicates the constitutionally-guaranteed right of the defendant to present a defense. Therefore, such preclusion is not reviewed on a conventional abuse of discretion standard, as are most evidentiary rulings, but rather by application of the test put forth in *Taylor v. Illinois,* 484 U.S. 400, 414–15, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988), urging a balancing of "the defendant's right to offer the testimony of witnesses in his favor" with and against the following "countervailing public interests":

> The integrity of the adversary process, which depends both on the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process. . . .

*Id.* "Application of the *Taylor* factors is a legal question which we review de novo." *United States v. Levy–Cordero,* 67 F.3d 1002, 1013 (1st Cir.1995).

Most cases upholding preclusion of an alibi defense involve willful misconduct by the defense. *See Bowling v. Vose,* 3 F.3d 559, 561–62 (1st Cir.1993) (collecting cases from various circuits). The court did not explicitly make a finding of willfulness on the part of defense counsel here, instead stating that there was neither "good cause" for defense counsel to have taken so long to have found the alibi evidence at issue, nor to have waited for the day of trial to make a request to admit the evidence. Assuming without deciding that the court was wrong to exclude the alibi evidence in the absence of an explicit finding of willful misconduct by the defense,[16] we conclude that any error in the exclusion of the evidence was harmless.

Villamán–Rodríguez's proffer described documents and the testimony of witnesses indicating that he "was awarded a written recognition for his arrangement and participation in the inauguration of a commercial establishment" on the night of April 7, 1995. Chévere openly acknowledged that his memory was vague as to the time and date of the transaction with Villamán–Rodríguez, testifying only that the transaction happened either sometime on April 7th or on the morning of April 8th.[17] Given this span of time, Villamán–Rodríguez's participation in the recognition ceremony would not have precluded his participation in the drug transaction. Moreover, Villamán–Rodríguez was present during the drug transaction only intermittently. He appeared briefly at Don Pedro's bar, and then left with Don Pedro in a car. Don Pedro apparently spent only a short time with Villamán–Rodríguez: when Don Pedro returned to the bar on foot afterwards, he said that Villamán–Rodríguez had dropped him off, and he had returned to the bar because he had grown tired of waiting for Villamán–Rodríguez's return. Afterwards, Villamán–Rodríguez pulled up to the bar in a

---

**16.** Some circuits have explicitly or implicitly held that, under *Taylor,* only willful discovery violations justify exclusion. *See United States v. Peters,* 937 F.2d 1422, 1426 (9th Cir.1991) ("[T]he [Supreme] Court has upheld the drastic remedy of excluding a witness only in cases involving 'willful and blatant' discovery violations.") (citing *Taylor,* 484 U.S. at 408, 108 S.Ct. 646). For a less explicit but similar holding see *Escalera v. Coombe,* 852 F.2d 45, 48 (2d Cir. 1988) (stating "absence of a good excuse is not necessarily commensurate with 'willful' conduct"; case remanded for finding as to whether "attorney's conduct was sufficiently willful under *Taylor* to support preclusion"). We, however, have never held that willfulness is the sole predicate of an exclusionary sanction. *See, e.g., Chappee v. Vose,* 843 F.2d 25, 29 (1st Cir.1988) (stating that *Taylor* "declined to cast a mechanical standard"). *See also United States v. Johnson,*

970 F.2d 907, 911 (D.C.Cir.1992) (stating that "any requirement of bad faith as an absolute condition to exclusion would be inconsistent with the *Taylor* Court's reference to trial court discretion and its extended discussion of the relevant factors"; case nonetheless remanded for explicit application of *Taylor* factors given trial court's finding of good faith of counsel).

**17.** It was established, through the introduction of the mailing labels from the interdicted packages, that Chévere mailed the cocaine to Rochester shortly before noon on April 8th, but he could only specify that he obtained it sometime in the 24 hour period before he mailed it. He was not asked, nor did he in any way indicate, whether the transaction involving Villamán–Rodríguez took place at any specific time of day.

car and spoke to Don Pedro on the street very briefly, without leaving the car. Villamán–Rodríguez had presumably deposited the cocaine in Don Pedro's apartment before this last brief visit, since it was only after that visit that Don Pedro indicated to Chévere that he could pick up the cocaine at Don Pedro's apartment. Nothing about the alibi evidence described by counsel would have supported a finding that Villamán–Rodríguez's participation in the ceremony precluded two brief trips to Don Pedro's bar or the deposit of cocaine at Don Pedro's apartment. *See United States v. Tolliver,* 61 F.3d 1189, 1206 n. 19 (5th Cir.1995) (motion to depose alibi witness denied where proffer was inadequate to indicate testimony would establish continuity of presence).[18]

▇▇▇ Even errors of constitutional magnitude can be harmless. "[I]f the prosecution can prove beyond a reasonable doubt that a constitutional error did not contribute to the verdict, the error is harmless and the verdict may stand." *Satterwhite v. Texas,* 486 U.S. 249, 256, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988) (citing *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (if "reasonable possibility" that the exclusion influenced the verdict, error not harmless)). For the reasons indicated above, we find beyond a reasonable doubt that any error in the exclusion of the alibi evidence did not affect the verdict against Villamán–Rodríguez.

### (ii). Villamán–Rodríguez's claim regarding allegedly withheld evidence

▇▇▇ Villamán–Rodríguez alleges that Chévere gave a physical description of "Chico el Dominicano" in his original interviews with Agent Ocasio of the Puerto Rico Police, DEA Task Force, that a written record of this description is on file with the DEA, and that his request to order the government to produce it was denied by the court. The government claims that no such document is in its possession, and it is far from clear from the record that any such document actually existed. The only indication of its existence is the testimony at trial of Agent Ocasio, who stated that he remembers that Chévere gave a physical description of "Chico."[19] Under cross- and recross-examination by Villamán–Rodríguez's counsel, Ocasio repeatedly insisted that the description was noted down, and therefore a written record of it "has to be in the [DEA] file."

After the court had established that Ocasio was not the custodian of the DEA files on Villamán–Rodríguez, and that the DEA file on Villamán–Rodríguez that the prosecution possessed did not contain such a written description, Villamán–Rodríguez's counsel concluded argument on this issue by stating: "[Y]our Honor, I will respectfully request again that if any such description appears, that it be provided to me." Since the court had already established that the document was not in the immediate possession of the prosecutors or the witness, Villamán–Rodríguez's only remaining remedy was to request that the court order the government to conduct a more extensive search of DEA or prosecutorial files for the document referred to by Ocasio. It was pointless to simply request that the court order the government to produce a document it said did not exist. Yet that is the unmistakable import of counsel's comment to the court. Villamán–Rodríguez cannot now argue on appeal that the court erred in refusing to order a more extensive document search that he never re-

---

18. This opinion was vacated as to the firearms convictions of two of the numerous defendants by the Supreme Court. *See Sterling v. United States,* 516 U.S. 1105, 116 S.Ct. 900, 133 L.Ed.2d 834 (1996); *Moore v. United States,* 419 U.S. 802, 117 S.Ct. 40, 136 L.Ed.2d 4 (1996). The firearms and narcotics conspiracy convictions of the defendant making the alibi proffer (Gennero Arthur) were not reversed on remand. *See United States v. Tolliver,* 116 F.3d 120, 124 n. 4 (5th Cir.1997).

19. Villamán–Rodríguez claims that this description indicated a younger man, and further claims that its existence is corroborated by an officer's (either Ocasio's or his partner's) surprised exclamation on first seeing Villamán–Rodríguez ("This is an old man"). His theory is that Chévere's description of "Chico," if in fact the description of a younger man, would impeach Chévere's in-court identification of Villamán–Rodríguez, aged 49 at the time of trial.

quested. *See City of Hope Nat'l Med. Ctr. v. Healthplus, Inc.*, 156 F.3d 223, 230 n. 8 (1st Cir.1998) (absent extraordinary circumstances, arguments not raised squarely in the lower court cannot be broached for the first time on appeal).

### 3. Portela's Sentencing Objections

Portela offers three objections to his sentencing: one to the procedure used at his sentencing hearing, and two substantive claims regarding a proposed downward adjustment and a proposed guideline departure.

### (a). The Procedure Used at Sentencing

■ Pursuant to the sentencing guidelines, a probation officer issues a presentence report with a sentencing recommendation which the parties may challenge, and which the court may accept or reject. The presentence report recommended for Portela a two-level downward adjustment in offense level for being a "minor participant" in the criminal activity under U.S.S.G. § 3B1.2(b). Portela claims that the government surprised him by objecting for the first time to the report's characterization of him as a "minor participant" at the sentencing hearing. Under Fed.R.Crim.P. 32(b)(6)(B), the parties are instructed to exchange objections to the presentence report within fourteen days after receiving it. However, the court stated that it would not have accepted the presentence report's recommendation even without the government's objection.

Portela objects that, if so, the district court should have notified the defense that it did not intend to follow the presentence report in advance of the hearing. However, in *United States v. Canada*, 960 F.2d 263, 266–67 (1st Cir.1992), we held that the court need not provide notice of its intended divergence from the report prior to the hearing. So long as the court's determination involved adjustments *under* the provisions of the guidelines and not departures *from* the

guidelines, "the guidelines themselves provide notice to the defendant of the issues about which he may be called upon to comment." *Id.* at 267. There was no error in the procedure used at sentencing.

### (b). The Proposed Downward Adjustment

■ Portela disputes the finding that his "not guilty" plea precluded a two-level reduction for "acceptance of responsibility" under guideline § 3E1.1(a). Portela argues that he merely went to trial to pursue the "multiple conspiracies" argument, and was therefore attempting to raise a *"legal"* issue. The government responds that, by pleading not guilty on the substantive, non-conspiracy counts (alleging his possession of cocaine in each of his two transactions), Portela *factually* denied guilt in those individual transactions. Also, at sentencing Portela continued to deny being part of the larger conspiracy for which he was nonetheless convicted.

The guideline in question rewards guilty pleas which save the government the time and expense of going to trial. *See* U.S.S.G. § 3E1.1(b)(2); *United States v. Cunningham*, 103 F.3d 596, 598 (7th Cir.1996). There are "rare" exceptions in cases where a defendant went to trial to "assert and preserve issues that do not relate to factual guilt," such as constitutional challenges to a statute, or challenges to a statute's applicability to his conduct. U.S.S.G. § 3E1.1, comment. (n.2). The commentary adds that "pretrial statements and conduct" are the primary basis for any determination of acceptance of responsibility. *Id.* Portela offers no support for the position that his multiple conspiracy argument was a legal issue rather than a simple "issue related to factual guilt," and he offered no clear expression of contrition before trial. The court's statement on the issue indicates that it construed the guideline correctly and had adequate factual support for its determination.[20]

---

**20.** The court's statement follows:

Now, defendant [Portela] went to trial. He never accepted responsibility. He went to trial on Count One [the conspiracy] and also on ... [substantive] Counts Thirteen and Fifteen [cocaine possession]. Even if I accept that he says, "Well, I was not guilty as to Counts Thirteen and

Fifteen," he never said, "Judge, I am going to plead guilty to Thirteen and Fifteen, I am going to try this [conspiracy] one." He never said that. And he put the government through trial preparation, and I don't think he qualifies for acceptance of responsibility.

### (c). The Proposed Guideline Departure

The government's 1996 sting operation against Portela was a "reverse sting" operation, so-called because the government, not the target, provides the controlled substance. Portela argues on appeal that the government's reverse-sting operation against him was, alternatively, so unusual or so clearly "devised" and "controlled" by the government as to constitute a mitigating factor that merits a special departure from the sentencing guidelines under U.S.S.G. § 5K2.0. While affirmative decisions to depart from the guidelines are reviewable on appeal, we ordinarily lack jurisdiction to review a decision not to depart, unless the sentencing court erroneously believed it lacked the authority to depart. *See United States v. Mangos,* 134 F.3d 460, 465 (1st Cir.1998); 18 U.S.C. § 3742(f).

At the sentencing hearing, counsel for Portela argued that the use of a reverse-sting operation against her client was unusual enough to warrant a downward departure:

> What I am saying here is that it was a setup, a reverse sting operation where drugs were offered or were in the possession or belonged to the person who is the informant in this case. The drugs did not belong to Mr. Portela.

> What I am saying now is that for purposes of departure, under 5K.2 [sic], I believe it is, it is allowed by cases in our circuit that when cases differ from the ordinary cases, that the Court may go a downward departure.

The court responded as follows:

> [I] believe that obviously this defendant is not the type of defendant that the courts thought about when talking about departure for extraordinary circumstances. There is nothing the defendant has provided to this Court to show why he is so distinct from others.... [T]ruly and simply, there is nothing, not even a scintilla of why this case is atypical or should be taken

out of the heartland. This is a run-of-the-mill case. Sting operations are there galore, and certainly the Sentencing Commission knew about these sting operations, and that's why it is not atypical. It is part and parcel of the Government's tools to interdict drugs.... [T]here is no basis for me to find on the record from the facts of this case that this is an atypical case for a downward departure, and I will not then depart.

The court's statement indicates that it correctly apprehended the legal standards governing departures. In *United States v. Rivera,* 994 F.2d 942, 949 (1st Cir.1993), we cited four considerations in determining the appropriateness of departures under U.S.S.G. § 5K2.0: (1) does the case have features taking it outside the "heartland" of typical cases contemplated by the existing guidelines, and has the Commission elsewhere (2) forbidden, (3) encouraged, or (4) discouraged departures based on these distinguishing features? The court found that no features of Portela's case distinguished it from the heartland of cases contemplated by the guidelines, thus ending the inquiry under *Rivera.* Although "appellate jurisdiction may attach if it appears that the failure to depart stemmed from the sentencing court's mistaken impression that it lacked the legal authority to deviate from the guideline range or, relatedly, from the court's misapprehension of the rules governing departures," *United States v. Gifford,* 17 F.3d 462, 473 (1st Cir.1994), that was clearly not the case here. In these circumstances, we are without jurisdiction to review the court's discretionary decision not to depart from the sentencing guidelines.

For all of the reasons given above, we **affirm** the judgments and sentences.

---

There is a note in Section 3E1.1. Note Two. It says, "This adjustment is not intended to apply to a defendant who puts the Government through the burden of proof at trial by denying the essential factual elements of guilt, he is convicted and only then admits guilt and expresses remorse," which I haven't heard yet.

[The exceptions listed in the commentary to the guideline do not apply] in this case. As a matter of fact, he's denying that he was a conspirator, and he's still denying that to the probation officer. So it seems to me that he doesn't come within the spirit nor the letter of acceptance of responsibility.