**RASHON LEWIS, Appellant**

**v.**

**GOVERNMENT OF THE VIRGIN ISLANDS, Appellee**

D.C. Crim. App. No. 1997-035

District Court of the Virgin Islands

Division of St. Thomas and St. John

December 3, 1999

George H. Hodge, Jr., Esq., St. Thomas, U.S.V.I., *for Appellant*

Maureen Phelan Cormier, Esq., Assistant Attorney General, St. Thomas, U.S.V.I., *for Appellee*

FINCH, *Chief Judge*

## OPINION OF THE COURT

PER CURIAM.

Appellant Rashon Lewis ["Lewis"] contends that this tribunal must reverse or vacate his jury convictions for aggravated rape, V.I. Code Ann. tit. 14, §§ 1700-01, first degree robbery, *id.* § 1862(2), and possession of a dangerous weapon during a violent crime, *id.* § 2251(a)(2). Exercising jurisdiction under 4 V.I.C. § 33, we disagree and affirm.

175

## FACTUAL SUMMARY

The testimony and evidence presented by the government at trial demonstrated that on Saturday, June 3, 1995, Odette Samuel ["Samuel"], a resident of Tortola, British Virgin Islands, completed the Scholastic Aptitude Test at Charlotte Amalie High School in St. Thomas. While Samuel waited in front of the school for a friend to pick her up, she noticed a young black man with braided hair standing in the school's guard booth. According to Samuel, this young man wore a large, green plaid shirt with long sleeves, black pants cut below the knee, and a gold chain. At one point, Samuel saw the young woman who sat next to her during the test speak to this youth and then leave the guard booth. The young man later left the school grounds while Samuel continued to wait for her friend, alone. (*See* Appellant's Br. at 4; Appellee's Br. at 7.)

Samuel then walked back into the empty school building and found the ladies' restroom. As Samuel was leaving the restroom, an individual that she recognized as the young man from the guard booth pushed her against the restroom wall, told her not to scream, and ordered her to remove her underwear. The young man held a gun. After Samuel refused, the assailant cocked the gun, placed it against her head, and again ordered her to remove her underwear. Samuel complied. The young man placed the gun on the floor and raped her. He then asked her whether she had any money, and took about $400 from her. (*See* J.A. at 11-14.)

When the young man left, Samuel washed herself thoroughly in the restroom sink, wishing "to act like it never did happen." (*See id.* at 14-15.) She called a friend who lived nearby, Boyd Todman ["Todman"], and asked him to transport her to the ferry. After Todman arrived at the school, Samuel told him that she wanted to return to Tortola and never set foot on St. Thomas again. Todman knew Samuel was upset, and refused to take her to the ferry until she explained what was bothering her. Samuel began to cry, and told him that she had been raped. (*See id.* at 15-18, 36-39, 41.)

Todman quickly looked around the school area for the assailant, and then contacted the police. Some time passed before Samuel reluctantly agreed to accompany the police to the hospital. (*See id.* at 42-43.) There, Dr. Leighmin Lu examined Samuel and took fluid and hair samples from her genital area. Her examination revealed

176

no signs of forcible sex, but indicated that Samuel had engaged in intercourse during the day. (*See id.* at 102-04.) Experts on DNA analysis and hair analysis later conceded at trial that little forensic evidence was available to support Samuel's allegation.[1]

Later that day, the police took Samuel back to the school to review picture albums of Charlotte Amalie High School students. Although they did not have time to review all of the students' photographs, Samuel identified the young woman who had sat next to her during the test. That woman, Leslie Petersen, told the police that the man with the braided hair and green shirt that she had spoken to in the guard booth was Rashon Lewis. (*See* Appellant's Br. at 6.)

The next morning, the police picked up Samuel's mother at the ferry station in Red Hook and took Samuel and her mother to the police station in Tutu Park. They planned to take Samuel and her mother back to Charlotte Amalie High School and continue looking at students' pictures. (*See* J.A. at 53.) Meanwhile, the police contacted Lewis' mother and asked her for a photograph to use in a photo array of suspects. Lewis' mother informed the police that she did not have a suitable picture, but would bring her son to the Charlotte Amalie police station that morning. (*See id.* at 52.)

Lewis and his mother arrived at the station later in the morning, and spent several hours speaking to the police and waiting for other officers to arrive. Ultimately, they decided that they would not cooperate in the police investigation. Around two o'clock in the afternoon, the police told Lewis and his mother that they could leave the station. By this time, the police had arranged for Samuel to sit in a police car by the station so she could view Lewis as he departed. At that time, however, the police did not tell Samuel that they had identified the young man in the guard booth as Rashon Lewis, or that he would soon exit the station.[2]

---

[1] (*See id.* at 59 ("[T]here was no DNA testing done because there was nothing found to compare any of the questioned items from the rape kit . . . with the known blood or saliva samples.") (statement of Dr. Joseph Errera), 62 ("I found hair fragments but those hairs do not lend themselves also to forensic comparison purposes.") (statement of Dr. Chris Allen).)

[2] (*See id.* at 19-20, 47-48; *see also id.* at 142 ("I made contact with [the officers accompanying Samuel] to let them know at some point [that Lewis'] mother should have been

177

Lewis then left the station. According to the testimony of Lewis' mother, an officer followed Lewis outside the station, briskly entered the car where Samuel and her mother sat, quickly spoke to someone inside, and lowered a window. (*See id.* at 128-29.) Samuel saw Lewis, pointed at him, and sobbed, "that's the man, he's over there." (*See id.* at 49.) The police then arrested the appellant.

Before trial, Lewis moved to suppress Samuel's out-of-court identification and asked the trial court to appoint a private investigator "to assist him and his attorney in the investigation and preparation of the defense of this case." (*See id.* at 120-52, 6 (Def.'s Request for Authorization to Retain Investigator, July 18, 1995).) The trial court denied these requests. At trial, Samuel failed to recall that she initially described Lewis' face as pointed or narrow. (*See* J.A. at 24-26.) The trial concluded and the trial judge denied Lewis' renewed motion for acquittal. Thereafter, the jury found Lewis guilty of aggravated rape, first degree robbery, and possession of a dangerous weapon during a crime of violence. Lewis received a sentence of twenty-five years' imprisonment on the first count, fifteen years on the second, and two years on the third, the sentences to run concurrently. (*See id.* at 3-5 (J., Jan. 28, 1997).) He filed a timely appeal.

### DISCUSSION

Lewis asserts that the trial court erred by denying his motions for acquittal, appointment of a private investigator, or suppression of the "show-up" pre-trial identification. Our plenary review of the trial judge's decisions of law, see *Government of the Virgin Islands v. Christopher*, 38 V.I. 193, 196, 990 F. Supp. 391, 393 (D.V.I. App. Div. 1997), reveals no reason to disturb the judgments of conviction.

### 1. Sufficiency of the Evidence

■ First, the testimony adduced by the government at trial convinced the jury beyond a reasonable doubt that Lewis displayed and threatened to use a handgun against Samuel in order to

---

bringing him in.") (statement of Officer L. Thomas), 150 ("Q: So, no explanation was given to [Samuel] for waiting [outside the police station] for 40 minutes? A: No.") (response of Officer A. Chesterfield).)

have sexual intercourse with her and to permanently deprive her of personal property. *See supra.* Like the trial judge, we view this testimony in the light most favorable to the government and draw all reasonable inferences in the prosecution's favor when considering a motion for acquittal. *See Government of the Virgin Islands v. Grant,* 1984 U.S. Dist. LEXIS 16265, 21 V.I. 20, 24 (D.V.I. App. Div. 1984). We too find that this testimony was sufficient to convict Lewis of aggravated rape, robbery in the first degree, and possession of a dangerous weapon. *Cf.* 14 V.I.C. §§ 1700-01, 1862(2), 2251(a)(2) (identifying elements of charged offenses). Indeed, Samuel's testimony alone reasonably could have convinced a jury to convict the appellant on those charges. *See Government of the Virgin Islands v. Peets,* Crim. No. 82-11, slip. op. (D.V.I. Div. St. Thomas & St. John filed Oct. 29, 1982) ("uncorroborated testimony of the victim . . . is sufficient evidence for conviction").[3] The trial court correctly denied Lewis' motions for acquittal.

## 2. Refusal to Appoint Private Investigator

Second, Lewis casually asked the trial court to appoint a private investigator, Mr. Gaston Tuckett, "to assist him and his attorney in the investigation and preparation of the defense of this case." (*See* J.A. at 6 (Def.'s Request for Authorization to Retain Investigator, July 18, 1995).) Although numerous courts have held that trial judges may appoint investigators to assist indigent defendants in securing due process or the effective assistance of counsel,[4] defendants must explain precisely why such assistance is necessary. *See,*

---

[3] Lewis asserts that the trial judge ignored "local case law that says[,] to obtain a conviction in prosecution for rape[,] . . . testimony of [a] defiled female as to [the] fact of intercourse and lack of consent and use of force must be supported by other testimony such as that of the examining physician, admission of the accused, and testimony of other persons as to her condition after [the] alleged act." (*See* Appellant's Br. at 12 (citing *Brooks v. Government of the Virgin Islands,* 378 F.2d 338, 339 (3d Cir. 1967)) (internal quotation marks omitted).) This rule was never case law. *Brooks* and its progeny merely construed the Virgin Islands' rape corroboration law, formerly codified at 14 V.I.C. § 1706. Our Legislature repealed this rule more than twenty years ago, thus barring the door back "to the dark days when the victim rather than the defendant was on trial in a rape case." (*See* Appellee's Br. at 11.) The law does not support the appellant's contention.

[4] *See generally* Michael J. Yaworsky, Annotation, *Right of Indigent Defendant in State Criminal Case to Assistance of Investigators,* 81 A.L.R.4th 259 §§ 3-5 (1990 & Supp. 1998); *see also* Ruby B. Weeks, Annotation, *Right of Indigent Defendant in Criminal Case to Aid of State by Appointment of Investigator or Expert,* 34 A.L.R.3d 1256 (1970 & Supp. 1998).

*e.g., Caldwell v. Mississippi,* 472 U.S. 320, 323 n.1, 86 L. Ed. 2d 231, 105 S. Ct. 2633 (1985) (declining to decide what defendant would have to demonstrate under the Constitution to receive investigator's assistance because he "offered little more than undeveloped assertions that the requested assistance would be beneficial"); *United States v. Gonzales,* 150 F.3d 1246, 1251 n.4 (10th Cir. 1998) ("defendants must provide the . . . court with explicit detail showing why the requested services are 'necessary' to an adequate defense and what the defendant expected to find"); *Mason v. Arizona,* 504 F.2d 1345, 1352 (9th Cir. 1974) (concluding that state trial court did not violate defendant's due process and equal protection rights by refusing to appoint an investigator, since such appointments "depend[] upon the need as revealed by the facts and circumstances of each case," and defendant had not explained the basis of his request).

■ Lewis failed to expound on the reasons for his motion. His motion did not explain what factual issues the investigator would explore, how those issues pertained to his defense, or why counsel could not perform the desired investigation. *See Mason,* 504 F.2d at 1352 ("If a reasonable showing of this kind is made, the state trial court should probably view with considerable liberality a motion for such pre-trial assistance.") (citations omitted). Lewis never established that he needed an investigator for his defense. Consequently, we cannot conclude that the trial court deprived him of due process by denying his motion for appointment of an investigator.[5]

Section three of the Revised Organic Act explicitly incorporates the due process and effective assistance of counsel clauses of the federal Constitution. *See* Rev. Org. Act § 3. The complete Revised Organic Act is located at 48 U.S.C. §§ 1541-1645 (1994), *reprinted in* V.I.C. 73-177, Historical Documents (1995 & Supp. 1999) (preceding Title One of *Virgin Islands Code*).

[5] For the first time on appeal, Lewis also argues that due process requires the Appellate Division to vacate his jury convictions because the government "engaged in prosecutorial misconduct by attempting to mislead [the] court [concerning Dr. Leighmin Lu's whereabouts] and suppress exculpatory evidence [from Mr. Patrick Webster] from the jury." (*See* Appellant's Br. at 20.) Lewis has not preserved this issue for appeal, and would not be able to show prejudice from the prosecutor's alleged malfeasance in any event. Both Dr. Leighmin Lu and Mr. Patrick Webster testified at trial. (*See* J.A. at 96-107; 111-119.)

## 3. Admission of Testimony Concerning Pre-Trial Identification

Lastly, Samuel exclaimed, "[t]hat's the man, he's over there," after the police brought Lewis within her view. (*See* J.A. at 19-20, 47-49, 128-29, 142, 150.) Under the Supreme Court decision in *Stovall v. Denno*,[6] any pre-trial identification conducted in an "unnecessarily suggestive [manner] conducive to [an] irreparable mistaken identification" violates the due process clause. *See Denno*, 388 U.S. 293 at 301-02, 87 S. Ct. 1967, 18 L. Ed. 2d 1199; *see also Kirby v. Illinois*, 406 U.S. 682, 690-91, 32 L. Ed. 2d 411, 92 S. Ct. 1877 (1972) (reaffirming rule established in Denno).[7]

The procedure that the police used to display Lewis to Samuel arguably was suggestive. Samuel waited in a police car outside the Charlotte Amalie police station before an officer quickly entered the vehicle, made a brief remark, and then lowered the car window to let her examine a single individual — the appellant. (*See* J.A. at 128-29.) This surprise "show-up" confrontation might have influenced Samuel's perception of the appellant. *See Denno*, 388 U.S. at 302 (acknowledging that "[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned") (footnote and citations omitted).

This procedure was no more suggestive than any "show-up" confrontation, however, and it was reasonably necessary under the unusual circumstances of the case. The police took special measures to avoid conveying any impression to Samuel that Lewis was her assailant. They did not tell her that they had identified the young man at the guard booth as Rashon Lewis, or that the suspect

---

[6] 388 U.S. 293, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967), *overruled on other grounds, Griffith v. Kentucky*, 479 U.S. 314, 326, 93 L. Ed. 2d 649, 107 S. Ct. 708 (1987) (discussing retroactivity of rules propounded by Supreme Court).

[7] In *Stovall's* companion cases, *United States v. Wade*, 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926 (1967), and *Gilbert v. California*, 388 U.S. 263, 18 L. Ed. 2d 1178, 87 S. Ct. 1951 (1967), the Supreme Court established the Constitutional right to counsel at pre-trial "show-ups" and "line-ups." Notwithstanding the Court's clear directive that trial judges "scrutinize any pretrial confrontation of the accused to determine whether the presence of his counsel is necessary to preserve the defendant's basic right to a fair trial," see *Wade*, 388 U.S. at 226-27, however, later justices confined this rule to post-indictment confrontations. *See Kirby*, 406 U.S. at 690. Hence, we presently cannot consider whether the trial court committed plain error by admitting the pre-trial identification in violation of the appellant's right to counsel.

would exit the station. (*See* J.A. at 150.) Police officers did not accompany Lewis out of the station or make any comment to Samuel regarding the appellant's guilt. Aside from the delay occasioned by the fact that Lewis and his mother continued to speak with officers in the police station, Samuel had no reason whatsoever to believe that her sighting of the appellant was not inadvertent.[8] Left with an uncooperative suspect, a complainant who intended to depart the territory, and little certainty that the picture albums at Charlotte Amalie High School contained a photograph of the appellant, this moderately suggestive procedure was reasonably necessary. *See United States v. Gaines*, 450 F.2d 186, 197 (3d Cir. 1971) (concluding that both "the fact that eye-witnesses might have quickly departed, and the considerations of reliability inhering in an immediate identification" justified "show-up" confrontation held shortly after crime allegedly transpired). The pre-trial identification procedure used by the police in this case was not so inherently unfair or impermissibly suggestive as to create a substantial likelihood of irreparable misidentification.

The criteria for evaluation of in-court identifications first established by the Supreme Court in *Simmons v. United States*, 390 U.S. 377, 384, 19 L. Ed. 2d 1247, 88 S. Ct. 967 (1968), buttress this conclusion. Samuel's identification of the appellant was reliable, given her ability "to view the criminal at the time of the crime, [her] degree of attention, the accuracy of [her] prior description of the criminal, the level of certainty demonstrated . . . at the confrontation, and the length of time between the crime and the confrontation." *See Neil v. Biggers*, 409 U.S. 188, 197, 34 L. Ed. 2d 401, 93 S. Ct. 375 (1972) (citing Simmons, 390 U.S. at 384).

■ Samuel had an unobstructed view of her attacker, who stood close to her for several minutes during daylight hours. The assailant riveted Samuel's attention by holding a gun to her forehead. Although she failed to recall at trial that she initially described Lewis' face as pointed or narrow, (see J.A. at 24-26), Samuel's description of Lewis' clothing and previous whereabouts were sufficiently accurate to allow Leslie Petersen to identify the

---

[8] (*See* id. at 48-49.) The record suggests only that Samuel was distracted by grief at the time. (*See id.* at 48 ("I tried to console Odette") (statement of officer B. Christopher).)

appellant. Finally, Samuel cried without hesitation, "that's the man, he's over there," upon seeing Lewis on the day after the crime. The trial court properly admitted her visceral identification of the appellant.

## CONCLUSION

Detecting no error in the trial court's application of the law to the appellant's motions for acquittal, appointment of a private investigator, and suppression of the victim's pre-trial identification, the Appellate Division shall sustain the verdicts reached against Lewis in Territorial Court.

DATED this 3d day of December, 1999.

## ORDER OF THE COURT

AND NOW, this 3d day of December, 1999, having fully considered the parties' submissions, and for the reasons set forth in the Court's accompanying Opinion of even date, it is hereby

ORDERED that the appellant's judgments of conviction are AFFIRMED.