# JENSEN KEN ALEXANDER, Appellant/Defendant
## v.
# PEOPLE OF THE VIRGIN ISLANDS, Appellee/Plaintiff

S.Ct. Criminal No. 2012-0020
Supreme Court of the Virgin Islands
January 29, 2014

JUDITH L. BOURNE, ESQ., Law Offices of Judith Bourne, St. Thomas, USVI, *Attorney for Appellant*.

ATIIM D. ABRAHAM, ESQ., Assistant Attorney General, St. Thomas, USVI, *Attorney for Appellee*.

HODGE, *Chief Justice*; CABRET, *Associate Justice*; and SWAN, *Associate Justice*.

## OPINION OF THE COURT

(January 29, 2014)

SWAN, *Associate Justice*. Jensen Ken Alexander was convicted of several crimes including rape and murder which he committed at Mandahl Beach in St. Thomas. Alexander asserts a number of evidentiary errors during the trial and additionally challenges the sufficiency of the evidence to convict him. Because we find that no reversible error was committed during trial, and that the evidence was sufficient to convict on all charges, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

Jensen Ken Alexander and Katanio Peets operated a small tourist attraction with their turtles at the Drake's Seat historical site. While working at Drake's Seat in the early afternoon of October 13, 2009, Alexander and Peets happenstancely encountered D.S. and Dennis Richardson. Richardson and D.S. invited Alexander and Peets to Mandahl Beach where Richardson and D.S. had been camping for the past three days. All four spent the remainder of the day at Mandahl Beach drinking, playing dominoes, and socializing. At some juncture, D.S. and Alexander went further down the beach to a secluded area to swim by themselves. (J.A. at 223.)

While at the beach, an altercation ensued between Alexander and Richardson allegedly because Alexander fondled D.S.'s crotch. During the verbal altercation, Richardson broke a window on Alexander's truck. Alexander threatened that Richardson would pay for what he had done. Alexander called the police. (*Id.* at 227.) The police responded to the disturbance and ordered everyone to leave the beach. Peets and Alexander departed the beach. (J.A. at 168.) However, D.S. and Richardson could not find the keys to Richardson's vehicle and decided to remain on the beach until morning. The police returned to the beach and instructed D.S. and Richardson to leave the beach because it was not safe and offered them transportation. (J.A. at 232-33.) D.S. and Richardson declined the offer, remained on the beach, and slept in their two-person tent.

Late that night, Peets and Alexander returned to Mandahl Beach on their way to a nightclub because Alexander thought he had left his cell phone on the beach. There are two divergent versions of what occurred next. D.S. testified that she awoke on the morning of October 14, 2009 to find Alexander on top of her in the tent, and Peets lying on top of a seemingly lifeless Richardson. (J.A. at 172.) She further testified that Alexander cut off her bathing suit with a knife and told her menacingly, "you will fuck me bitch." (J.A. at 170.) D.S. made eye contact with Peets and begged him for help, but Peets did not respond to her directly. (*Id.* at 172.) Peets stated to Alexander, "[l]et her go. I think we've killed him. Let her go." (*Id.*) However, Alexander proceeded to drag by her hair a completely naked D.S. out of the tent. After Alexander dragged her out of the tent, D.S. testified that Peets was nowhere to be found and that Alexander, by knife point, proceeded to sexually and physically assault her for the next hour. (J.A. at 176.)

On the other hand, Peets testified to his version of the facts, recounting that when he and Alexander drove onto the beach, D.S. and Richardson exited their tent upon hearing the vehicle. Peets further testified that an argument ensued between Alexander, Richardson and D.S. During the argument, Alexander exclaimed that "someone is gonna pay for [his] windshield now." (J.A. at 64.) The argument became very contentious, prompting Alexander to brandish a knife at D.S. (*Id.*) Peets testified that during this verbal altercation, he tried to act as peace maker and calm everybody down. D.S. attempted to retreat into the tent and Alexander proceeded to follow her. When Richardson attempted to assist D.S., Peets restrained Richardson and informed him that Alexander had a knife and would harm him. Alexander pulled D.S. out of the tent by her hair. (*Id.*) Peets testified that he screamed for Alexander to release her. Alexander, however, proceeded to cut off D.S.'s bathing suit with a knife. Richardson pleaded with Peets to help him to do something about the situation. (*Id.*) Peets stated that at this juncture he had enough of the situation and retreated to Alexander's vehicle intending to leave and seek help. When Peets looked behind him, he saw Alexander and Richardson engaged in a fracas.

Peets sat in the vehicle and attempted for about five to seven minutes to start the ignition without keys because the truck's keys had been stolen during a prior forced entry into the vehicle. (J.A. at 68.) When Peets succeeded in starting the vehicle, the scene became quiet; therefore, he proceeded to locate the others. He saw Richardson's lifeless corpse on the ground and said to Alexander "I think you kill him. Let's go. Let's go." (J.A. at 547.) Alexander did not respond. Peets testified that he did not see Alexander raping D.S. (*Id.* at 70-71.) Peets left the beach without Alexander, and as he left the beach Peets saw D.S. walking "back and forth." (*Id.* at 547-48.)

Peets returned to the beach sometime later and saw Alexander shirtless, wearing boxer shorts, and covered in blood. (*Id.* at 551.) He saw D.S. run toward the bushes near the water completely naked. (*Id.* at 552.) After he persuaded Alexander to enter the vehicle, Peets remarked; "you know that man dead right?" To which Alexander responded that he did not know he was stabbing him that hard. As they drove away from the beach, Alexander gave his knife to Peets who threw it outside the vehicle. (J.A. at 553.)

D.S. testified that she was able to escape from Alexander's onslaught of sexual assault and physical abuse when he was briefly distracted. She ran from the scene and jumped into a salt pond where she was able to swim out to sea and emerge on the other side of the beach. D.S. climbed onto shore and went down a nearby road until she came to the home of Brenda Walwyn. Naked and barefoot, she approached the house and knocked on the door. Walwyn allowed D.S. into her home, gave her some clothing, and called the police. (J.A. at 325-28.) D.S. was taken to Schneider Regional Medical Center where a rape exam was conducted upon her. (J.A. at 431.)

Alexander and Peets were subsequently arrested for the incidents of October 14 which resulted in the rape of D.S. and the murder of Richardson. Alexander was also taken to the hospital for injuries he received during his altercation with Richardson. Peets consummated a plea agreement with the People in which he pled guilty to being an accessory after the fact to the crimes committed by Alexander in exchange for his testimony against Alexander. Alexander was charged in an eight-count Information with the following: Count I, first degree murder in the killing of Richardson; Count II, aggravated rape in the first degree; Count III, aggravated rape in the first degree; Count IV, first degree rape; Count V, first degree rape; Count VI, first degree assault; Count VII, first degree assault; and Count VIII, carrying or using a dangerous weapon during the commission of a rape.[1]

After a jury adjudged Alexander guilty of all counts, he was sentenced to life imprisonment without parole for Count I, first degree murder.[2] For Count II, aggravated rape in the first degree, he received 25 years imprisonment to be served concurrently with his sentence for Count I.[3] For Count VI, first degree assault, and Count VIII, carrying or using a dangerous weapon during the commission of a rape, he received 10 years imprisonment on each count, to be served concurrently with the sentence imposed for Count I. These sentences were memorialized in a Judgment and Commitment dated March 28, 2012. This timely appeal ensued.

---

[1] Counts III and V were dismissed with prejudice.

[2] Count VII, first degree assault was merged with Count I and no separate sentence was imposed.

[3] Count IV, first degree rape, was merged with Count II and no separate sentence was imposed.

## II. JURISDICTION

Title 4, section 32(a) of the Virgin Islands Code provides, in pertinent part, that "[t]he Supreme Court shall have jurisdiction over all appeals arising from final judgments, final decrees or final orders of the Superior Court, or as otherwise provided by law." It is well established that in a criminal case, the written judgment embodying the adjudication of guilt and the sentence imposed based on that adjudication constitutes a final judgment for purposes of this statute. *Williams v. People*, 58 V.I. 341, 345 (V.I. 2013) (citing cases). A final Judgment and Commitment dated March 28, 2012 was entered in this case. Accordingly, we have jurisdiction over this appeal.

## III. ISSUES AND STANDARD OF REVIEW

Alexander posits a number of issues for review. His main contentions are that the trial court erred 1) in denying his Motion in Limine to exclude the contradictory testimony of Peets, 2) in *sua sponte* setting the time parameters for alibi witnesses' testimony, 3) in admitting a photo of the deceased Richardson into evidence, 4) in excluding evidence attacking the credibility of D.S., and 5) in limiting the testimony of a defense expert witness. He further contends, 6) that the evidence was insufficient to convict him of all crimes.

We review the Superior court's evidentiary rulings for abuse of discretion. *Francis v. People*, 56 V.I. 370, 379 (V.I. 2012). If the trial court's evidentiary ruling involves the application of legal precepts we exercise plenary review. *Billu v. People*, 57 V.I. 455, 461 (V.I. 2012); *Corriette v. Morales*, 50 V.I. 202, 205 (V.I. 2008). A trial court has wide discretion in determining whether to exclude otherwise admissible evidence under Rule 403 of the Federal Rules of Evidence, and we may not disturb the trial court's determination unless we find that the court acted arbitrarily or irrationally. *Francis*, 56 V.I. at 386. Similarly, the admission of expert testimony lies within the discretion of the trial court, and its judgment must not be reversed absent an abuse of discretion. *Westcott v. Crinklaw*, 68 F.3d 1073, 1075 (8th Cir. 1995).

Rulings that were not timely objected to at trial are reviewed for plain error. *United States. v. Leo*, 941 F.2d 181, 193 (3d Cir. 1991). A reversal is justified under the plain error standard of review only after an appellant establishes that: 1) there is error, 2) that is plain, and 3) that affects

substantial rights. *United States v. Fumo*, 655 F.3d 288, 309 (3d Cir. 2011). Even where all three prongs are satisfied, a court of review may exercise its discretion in noticing a forfeited error where the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Johnson v. United States*, 520 U.S. 461, 466-67, 117 S. Ct. 1544, 137 L. Ed. 2d 718 (1997) (internal citations and quotation marks omitted).

In reviewing a sufficiency of the evidence claim, we apply a "particularly deferential standard of review." *James v. People*, 60 V.I. 313, 319 (V.I. 2013); *Castor v. People*, 57 V.I. 482, 488 (V.I. 2012); *Stevens v. People*, 52 V.I. 294, 304 (V.I. 2009); *Smith v. People*, 51 V.I. 396, 398 (V.I. 2009). *Accord, United States v. Bansal*, 663 F.3d 634, 665 (3d Cir. 2011). Accordingly, we must affirm a jury's verdict so long as substantial evidence exists to allow a rational trier of fact to convict when the evidence is viewed in a light most favorable to the government. *James*, 60 V.I. at 320 (citing *United States v. Wright*, 665 F.3d 560, 567 (3d Cir. 2012)).

## IV. DISCUSSION

### A. The denial of the Motion in Limine was not error.

In a Motion in Limine, defense counsel attempted to exclude Peets's testimony because it contradicted the testimony of D.S. For instance, D.S. stated that she awoke in the tent around 12:30 a.m. on October 14, 2009 to find Alexander on top of her holding a knife, and that she saw Richardson lying motionless outside the tent with Peets on top of him. Peets, on the other hand, testified that D.S. and Richardson came out of the tent at approximately 11:00 p.m. on October 13, 2009, to confront him and Alexander. A verbal and physical altercation erupted among all except Peets, and as D.S. turned her back towards Alexander and proceeded into the tent Alexander immediately pulled her out of the tent by her hair. There were a number of other contradictions between the testimony of D.S. and Peets. Alexander asserts that allowing both D.S. and Peets to testify at trial "force[d] [him] to attempt to defend against two widely varying and incompatible factual versions of the crimes with which he was charged." (Br. of Appellant at 16.) Alexander further asserts that because the testimony of Peets and D.S. contradicted each other on

various facts, the testimony of Peets was unduly prejudicial, caused confusion of the issues, and was misleading to the jury in violation of Rule 403 of the Federal Rules of Evidence. (Br. of Appellant at 16.) We disagree.

Rule 403 allows for the exclusion of relevant evidence if:

> its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

■ Importantly, because all evidence is inherently prejudicial to the party against whom it is offered, Rule 403 does not bar all prejudicial evidence. *See Ballou v. Henri Studios, Inc.*, 656 F.2d 1147, 1155 (5th Cir. 1981). Rule 403 only serves to bar the evidence that is so unfairly prejudicial as to outweigh its probative value. *See Billu*, 57 V.I. at 464. In weighing the evidence and evaluating the incremental probative value of the evidence, the trial court must assume that the evidence will be believed by the trier of fact. *See Ballou*, 656 F.2d at 1154.

■ ■ Firstly, the testimony of Peets was not unfairly prejudicial as contemplated by Rule 403. As elucidated by the advisory committee notes to Rule 403, unfair prejudice within the context of Rule 403 means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." FED. R. EVID. 403, advisory committee's note. In essence, evidence which tends to lure the trier of fact to arrive at a conclusion on an improper, emotional or other basis is unfairly prejudicial. *See Old Chief v. United States*, 519 U.S. 172, 180, 117 S. Ct. 644, 136 L. Ed. 2d 574 (1997). The combined testimony of D.S. and Peets did not have the potential to lure the jury into evaluating the evidence based on emotion or other impermissible considerations.

■ Secondly, although the testimony of D.S. and Peets had some conflicts, these conflicts cannot reasonably be said to have confused the jury. Evidence considered to be of the type that confuses or misleads the jury is evidence that may lure the jury to consider matters other than those in dispute at trial or factors that should not be considered. *See, e.g., Gray v. GenIyte Group, Inc.*, 289 F.3d 128, 140 (1st Cir. 2002) (criminal conviction for misdemeanor of "accosting" was properly excluded due to danger of confusion because the conduct applicable to accosting fell short of conduct necessary to show sexual harassment); *United States v. Pires*,

642 F.3d 1, 11-12 (1st Cir. 2011) (in child pornography trial, expert testimony that defendant was not a pedophile was properly excluded because it "might well 'shift attention away from [a] key question — whether the defendant had knowledge of the contents of the videos — to a wholly irrelevant one — whether or not he is a pedophile' "). Here, the conflicting testimony of Peets and D.S. went to the crux of the matter — whether Alexander murdered Richardson and raped D.S. The testimony of Peets and D.S. were presented in furtherance of the People's position that Alexander committed these crimes; therefore, the testimony did not have the likelihood of luring the jury into considering some impermissible or irrelevant fact.

Further, Alexander asserts that Peets' testimony should have been excluded because it did not buttress the testimony given by D.S.; consequently, it was irrelevant and prejudicial. This argument is specious because any contradictions in the testimony would appear to be more detrimental to the People's case than to Alexander's defense because the contradictions would have tended to force the jury to question the credibility of one or both of the People's witnesses.

■ Although the testimony of Peets and D.S. was contradictory in some instances, the defense had ample opportunity to cross examine each of them and bring these inconsistencies to the jury's attention. *See Joseph v. Terminix Int'l Co.*, 17 F.3d 1282, 1284-85 (10th Cir. 1994) (trial court did not abuse its discretion in excluding "new evidence" plaintiff discovered over the last weekend of a trial, since it contradicted both plaintiff's prior testimony and was proffered after close of defendant's evidence and would have denied the defendant an opportunity to cross-examine and respond to expert testimony in a timely manner). At trial, the defense had every opportunity to discredit both witnesses by illuminating any inconsistencies in their testimonies. The determination of which version of the facts was more credible, Peets' or D.S.'s, was a function within the exclusive province of the jury. Significantly, the jury made the determination as to whether the contradictions were substantive or inconsequential to the guilt or innocence of Alexander, and whether the inconsistencies pertained to important or significant details, considering all other testimony elicited and evidence presented at trial. Importantly, Alexander conveniently ignores innumerable details in the testimony of both D.S. and Peets that unquestionably corroborate each other,

particularly as to the victimizing of D.S. by Alexander and Alexander's possession of the purported murder weapon on Mandahl Beach.

■ It is noteworthy that Alexander cites to no legal authority to support his contention that the admission of two witnesses' partially conflicting testimony prejudices a criminal defendant. Essentially, no legal authority, whether statute, court rule, or case law, exists which restricts the testimony that either side may present at trial to only testimony that is exactly consistent. We decline to create such authority here. Moreover, many criminal cases involve some degree of conflict in the testimony of witnesses, whether important or insignificant to the guilt or innocence of the defendant, which must be resolved by the jurors as the judges of the credibility of witnesses.

■ Importantly, had the trial court granted Alexander's Motion in Limine, the result would have been the trial court deciding which testimony or which version of the facts was credible for presentation to the jury. Such a result would have caused an encroachment into the jury's province. The law irrefutably declares that the jury, and not the court, determines the credibility of witnesses in a jury trial. *See United States v. Saada*, 212 F.3d 210, 221 n.12 (3d. Cir. 2000). "[I]t is the jury's special province to weigh conflicting testimony, determine credibility and draw factual inferences." *United States v. Montoya*, 827 F.2d 143, 155 (7th Cir. 1987) (internal quotation marks and citations omitted). *See also Cavazos v. Smith*, 132 S. Ct. 2, 4, 181 L. Ed. 2d 311 (2011) ("[I]t is the responsibility of the jury — not the court — to decide what conclusions should be drawn from evidence admitted at trial.").

Further, the jury was properly instructed on how to rationalize conflicting testimony, and informed that it was free to disregard or accept testimony as it deemed proper. The court instructed that:

> In deciding the facts, you have to . . . decide what testimony to believe. You may believe everything that a witness says, part of it or none of it.
>
> . . . .
>
> Of course, a simple mistake by a witness does not mean that he or she is not telling the truth as he or she remembers it since people sometimes hear and see things differently and sometimes forget things. You need to consider whether a contradiction is an innocent lapse of memory or an intentional falsehood and that may depend on whether it has to do with an important fact or only a small detail.

If a person is shown to have knowingly testified falsely concerning an important matter, you have the right to distrust the testimony of that witness concerning any other matter. You may accept or reject some or all of the testimony of the witness and give it as much or as little weight as you think it deserves.

(J.A. at 1069-70.)

The defense emphasized the conflicting statements of Peets and D.S. in its closing arguments; therefore, the issue was presented to the jury for its consideration. (J.A. at 1028-1048). Accordingly, we conclude that it was not an abuse of the Superior Court's discretion to deny Alexander's Motion in Limine.[4]

### B. Alexander was not prejudiced by the trial court's *sua sponte* action in setting time parameters.

On August 12, 2011, the government filed a Demand for Notice of Alibi. Three days later, Alexander filed an objection to the Demand, stating that the People failed to specify a date and time of the offense on which it intended to rely. The People failed to respond to the objection in a timely manner. Therefore, in an Order dated August 30, 2011, the trial court overruled the objection and specified the time parameters as between 12:25 a.m. and 6:02 p.m. on October 14, 2009. (J.A. at 80.) Alexander argues that the trial court overstepped its boundaries and acted *ultra vires* when it set the time parameters for the presentation of the notice of alibi. Alexander did not properly preserve for review the issue of whether the court exceeded its authority in setting the time parameters for the notice of alibi. Therefore, we review for plain error whether the People failed to comply with the date and time requirements in framing its Demand for Notice of Alibi. *See United States v. Portela*, 167 F.3d 687, 704 n.15 (1st Cir. 1999).[5]

---

[4] Alexander also contends that the use of two witnesses with conflicting testimonies amounts to prosecutorial misconduct. Because we do not find any error in the use of the testimonies of Peets and Alexander, we find this issue moot.

[5] In *Portela*, "the [trial] court itself" set a deadline for the defense to disclose its intent to offer an alibi defense instead of leaving it to government-demand procedure under Rule 12.1. The Court of Appeals did not address the issue raised on appeal of whether the trial court "exceeded its general case management authority by eliminating the burden of triggering alibi defense discovery procedures that the prosecutor would otherwise bear under Rule 12.1(a)"

Rule 12.1 of the Federal Rules of Criminal Procedure outlines the requirements for a government's demand for notice of alibi:

> An attorney for the government may request in writing that the defendant notify an attorney for the government of any intended alibi defense. The request must state the time, date, and place of the alleged offense.

FED. R. CRIM. P. 12.1(a)(1).

■ Generally, the defense need not disclose its intent to proffer an alibi defense if the government's demand fails to specify the time, date, and place of the offense as required in Rule 12.1. *United States v. Saa*, 859 F.2d 1067, 1072 (2d Cir. 1988). The government must state with specificity the date and time of the notice for alibi requested, and a defendant is not required to respond to unnecessarily vague alibi demands for time, place, and date. *United States v. Bickman*, 491 F. Supp. 277, 279 (E.D. Pa. 1980). Therefore, the failure of the People to specify the time and date requirements in its Demand for Notice of Alibi was error, because this failure was a clear violation of the express requirements of Rule 12.1. Nevertheless, the plain error standard is still not satisfied here because this error did not have any effect on Alexander's substantial rights.

■ Alexander has failed to specify how the trial court's setting of the time parameters prejudiced him. There is little case law that addresses the ramifications of failing to comply with the date and time specifications mandated by Rule 12.1(a)(1). In jurisdictions with statutes or court rules similar to Rule 12.1, where the government is required to specify date and time in demand for notice of alibi, state courts have held that such provisions are not intended to compel the exclusion of evidence or mandate retrials for mere technical errors, and that the defendant is required to show prejudice resulting from government's failure to specify date and time in order to be entitled to relief. *Brown v. State*, 436 N.E.2d 285, 286-88 (Ind. 1982) ("[I]t would amount to an elevation of form over substance were the trial court unable to include the potential prejudice — or lack thereof — to a party in its assessment of whether to impose the sanctions" for failure to comply with demand requirements.).

---

because the issue was not challenged by raising it before the trial court at any point during the proceedings, and was thus not properly preserved. 167 F.3d at 704 n.15.

■ Although the rules provide the time, manner, and method in which the government must make its demand and disclose notice of alibi, it is in the trial court's discretion to decide whether any violation of the rule mandates a sanction or exclusion. *United States v. Bissonette*, 164 F.3d 1143, 1145 (8th Cir. 1999).

■ Although the prosecution in *Portela* failed to comply with specificity as to the time requirements of Rule 12.1, the court held that the requirements of Rule 12.1 did not apply because the trial court set its own requirements, and such requirements did not prejudice the defendant. 167 F.3d at 704-05. In the present case, even though the People failed to comply with the demand for notice of alibi requirements under Rule 12.1, Alexander has failed to specify what prejudice he suffered by the People's failure to specify a time and date in its demand for notice of alibi. The Information in which the crimes are charged specified the date on which the People contended that Alexander committed the crimes. Further, the affidavit of Detective Cherese Thomas, which was filed with the Information in this case and to which Alexander had access, is part of the trial court's record, and Alexander certainly must have received a copy; it specified the time sequence in which the offenses were alleged to have occurred. Therefore, Alexander had access to information of the time sequence and date of the offenses as charged, which he would need to formulate and to present his alibi in defending against those charges. This contention is expressly buttressed by the following.

Each count in the Third Amended Information begins with "on or about October 14, 2009, in St. Thomas, Virgin Islands." The affidavit of Cherese Thomas which is attached to the Information explicitly states in the second paragraph:

> That major crime unit was assigned to investigate a homicide that occurred on Wednesday, October 14, 2009, sometime between the hours of 12:25a.m. and 6:02 a.m., on Mandahl Beach, St. Thomas Virgin Islands.

Accordingly, because Alexander was not prejudiced in any perceivable way with regards to the Demand for Notice of Alibi, there is no reversible error.

501

## C. The trial court erred when it admitted a photo of the victim into evidence, but the error was harmless.

Alexander asserts that the trial court abused its discretion when it admitted into evidence People's exhibit 13 which is a photograph of Richardson alive and smiling. Alexander contends that the photograph served no other purpose than to evoke the sympathy of the jury by showing the deceased when he was alive and to encourage the jury to "overlook the discrepancies in the proof in order to avenge the murder of this pleasant-looking, smiling man." (Br. of Appellant at 17.)

Relevant evidence is defined as evidence tending to "make a fact more or less probable than it would be without the evidence[ ] and . . . the fact is of consequence in determining the action." FED. R. EVID. 401. The People claim that the photo was relevant in proving the identity of the victim and that Richardson was in fact deceased. However, Richardson's identity and status as deceased were never an issue at trial. Detective Neal Baily testified that Richardson was identified by his driver's license which was found on Richardson's body. A photograph of that license was admitted into evidence. There was ample testimony by D.S. and Peets presented at trial, confirming the activities that occurred prior to Richardson's death and obviously substantiating that Richardson was alive when the fracas between him and Alexander began. Further, Doctor Francisco Landron, the medical examiner, testified that Richardson was deceased, and he elaborated on the cause of Richardson's death. Undoubtedly, the photograph of Richardson could not have had any tendency in proving a material fact and did not have any probative value whatsoever because of the other evidence in the case. At best, the photograph was cumulative.

The danger of unfair prejudice exists where the evidence has the tendency of appealing to the sympathies of the jury, arousing a sense of horror, provoking an instinct to punish, or otherwise cause the jury to base its decision on something other than the established propositions in the case. *Carty v. People*, 56 V.I. 345, 358 (V.I. 2012) (quoting *Bhaya v. Westinghouse Elec. Corp.*, 922 F.2d 184, 193 (3d Cir. 1990)). We agree with Alexander that the trial court abused its discretion in admitting exhibit 13 because the photograph had no relevancy in establishing the guilt or innocence of Alexander. On the contrary, the evidence created the risk of arousing the sympathies of the jury. While all evidence is

inherently prejudicial to the party against whom it is offered, exhibit 13 undoubtedly had no probative value in proving that Alexander murdered Richardson and should not have been admitted.

Nonetheless, the Superior Court's error in the admission of exhibit 13 was harmless considering the overwhelming evidence presented against Alexander. "No error or defect in any ruling or order or in anything done or omitted by the Superior Court or by any of the parties is ground for granting relief or reversal on appeal where its probable impact, in light of all of the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties." V.I.S.Ct.R. 4(i). *See Williams v. People*, 59 V.I. 1043, 1049 (V.I. 2013); *Brown v. People*, 54 V.I. 496, 515 (V.I. 2010) ("An error in admitting evidence is not so prejudicial as to require a new trial when there is other overwhelming evidence of the defendant's guilt."). Despite the abuse of discretion of the trial court in admitting in evidence exhibit 13, there was overwhelming evidence, when viewed in the light most favorable of the People, from which a reasonable jury could convict Alexander. We discuss the sufficiency of the evidence in more detail *infra*.

### D. Failure to utilize the procedures of Rule 412 bars the argument that evidence attacking D.S.'s credibility should have been permitted.

During trial, the defense called Detective Cherise Thomas, intending to elicit testimony that after D.S. returned to the continental United States, she reported that Alexander had given her a sexually transmitted disease ("STD"). The defense intended to use this testimony to impeach the credibility of D.S., since Alexander's medical records indicate that he did not have an STD. The defense asserts that the testimony was not intended to claim that D.S. had an STD, thereby making a suggestion concerning her past sexual history, but that the testimony would prove D.S.'s "proclivity to make false accusations against the defendant." (Br. of Appellant at 19.)

The trial court excluded this testimony, reasoning that such testimony implicated the sexual history of D.S. and must be excluded because it would violate Rule 412 of the Federal Rules of Evidence which states in relevant part that:

> (a) Prohibited Uses. The following evidence is not admissible in a civil or criminal proceeding involving alleged sexual misconduct:

(1) evidence offered to prove that a victim engaged in other sexual behavior; or

(2) evidence offered to prove a victim's sexual predisposition.

██ The purpose of this Rule is to prevent a rape trial from shifting the focus away from the culpability of the accused toward irrelevant issues such as the sexual behavior and sexual predisposition of the victim. *See* FED. R. EVID. 412, advisory committee's note. However, Rule 412 does not exclude all evidence suggestive of a victim's sexual history. If the proposed evidence has some probative value, it may be admissible under the exceptions to Rule 412. Rule 412(b) provides the following exceptions to the general rule:

(b) Exceptions.

(1) Criminal Cases. The court may admit the following evidence in a criminal case:

(A) evidence of specific instances of a victim's sexual behavior, if offered to prove that someone other than the defendant was the source of semen, injury, or other physical evidence;

(B) evidence of specific instances of a victim's sexual behavior with respect to the person accused of the sexual misconduct, if offered by the defendant to prove consent or if offered by the prosecutor; and

(C) evidence whose exclusion would violate the defendant's constitutional rights.

██ The testimony that the defense sought to elicit from Detective Thomas could arguably fall within the exceptions found in subsections (b)(1)(A) and (C). For instance, the source of an injury, namely an STD, can be a permissible purpose for admission of evidence under Rule 412, if the evidence tends to exclude the defendant as the source of the injury. *United States v. Torres*, 937 F.2d 1469, 1473 (9th Cir. 1991). However, there is no indication in the record that Alexander filed a motion to present such evidence under one of the exceptions of Rule 412(b) as mandated by Rule 412(c).[6] Therefore, Alexander's failure to follow the procedures

---

[6] Federal Rule of Evidence 412(c) states in pertinent part that:
 (c) Procedure to Determine Admissibility.

enumerated in Rule 412(c) bars his ability to admit the evidence of D.S.'s alleged STD as an exception to Rule 412(a).

### E. The trial court did not abuse its discretion in limiting the testimony of the Defense's expert witness.

At trial, the defense called Doctor William Manion as an expert witness in forensic pathology, apparently intending to elicit testimony from this witness as to who was likely to have committed Richardson's murder based on the height, weight, and physical characteristics of the parties, in addition to the information in Richardson's autopsy report. The Superior Court did not abuse its discretion in limiting the scope of this testimony.

It is not uncommon for an expert in forensic pathology to testify concerning the cause and manner of death, depending on the injuries inflicted upon the deceased. For instance, based on the positioning and extent of wounds on a corpse, an expert can determine that the victim died because of stab wounds inflicted by a certain object or in a certain manner. *See, e.g., United States v. Ebron*, 683 F.3d 105, 139 (5th Cir. 2012) (wounds "were consistent with a victim being restrained from behind while being stabbed from the front"). Most uncommonly, however, Alexander seemingly planned to have Dr. Manion testify as to his opinion on the *identity of the assailant.*

The trial court restricted this line of testimony from Dr. Manion, ruling that such testimony was beyond his scope of expertise and would invade the province of the jury. (J.A. at 949-50). On appeal Alexander argues that it was error for the Superior Court to rule that Dr. Manion would not be permitted to testify about (1) the contents of any document or exhibit that were not in evidence, (2) the credibility of any of the testimony given by other witnesses in the trial, and (3) his opinion as to whether Alexander participated in the crimes. (Br. of Appellant at 20-21.) While Alexander argues that these restrictions upon Dr. Manion's testimony violated

---

(1) Motion. If a party intends to offer evidence under Rule 412(b), the party must:

 (A) file a motion that specifically describes the evidence and states the purpose for which it is to be offered;

 (B) do so at least 14 days before trial unless the court, for good cause, sets a different time;

 (C) serve the motion on all parties; and

 (D) notify the victim or, when appropriate, the victim's guardian or representative.

Federal Rule of Evidence 703 and deprived him of his Fifth Amendment and Fourteenth Amendment due process right to present his defense, there was no error in these rulings, much less an abuse of the trial judge's discretion in controlling expert testimony.

█ First, Federal Rule of Evidence 703 provides that while an expert may "base an opinion on facts or data in the case that . . . need not be admissible for the opinion to be admitted," it was expressly amended in recent years to specifically provide that such unadmitted or inadmissible material may _not_ be mentioned in the expert's testimony unless the trial judge makes an express finding that the material has such "probative value in helping the jury evaluate the opinion [as to] substantially outweighs the[ ] prejudicial effect" of recounting inadmissible material in the presence of the jury.[7] Alexander sought no such ruling, and the Superior Court clearly found the opposite. Thus the first restriction, barring the use of Dr. Manion's direct testimony to serve as a "conduit" for recitation of inadmissible materials, was correct.

█ Second, the restriction barring Dr. Manion from opining on the credibility of other witnesses is also in accord with the authorities, which uniformly hold that an expert witness may not intrude into an area consigned exclusively to the jury, such as credibility of a witness. See _Nimely v. City of New York_, 414 F.3d 381, 397-98 (2d Cir. 2005) (forensic pathologist could not testify as to the truthfulness of a police officer's

---

[7] See Advisory Committee note to 2000 amendments to Rule 704 ("Rule 703 has been amended to emphasize that when an expert reasonably relies on inadmissible information to form an opinion or inference, the underlying information is not admissible simply because the opinion or inference is admitted."). Alexander devotes the bulk of his argument on this issue to block quotation of several paragraphs from the Third Circuit Court of Appeals' decision in _In re Japanese Elec. Prods. Antitrust Litig._, 723 F.2d 238 (3d Cir. 1983), which he asserts "directly and forcefully" address the trial court's error in the present case. That decision is inapposite, however, since it was rendered prior to the language being added to Rule 703 barring experts from recounting inadmissible material, and the decision itself was reversed on other grounds by the United States Supreme Court. See _Matsushita Elec. Indus. Co. v. Zenith Radio Corp._, 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The decision also preceded the sea change of expert law under the federal rules in _Daubert v. Merrell Dow Pharms._, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and the hundreds of more recent decisions in America's appellate courts applying _Daubert_. Finally, the Third Circuit opinion addressed the importance of whether it was shown that experts in a particular field rely on certain types of inadmissible materials — it patently did not hold that experts were allowed to recount inadmissible material from the witness stand, or opine on the credibility of witnesses, or give an opinion on who committed the crime. See _Japanese Elec. Prods. Antitrust Litig._, 723 F.2d at 276-78.

statement or explain discrepancies in uncontroverted facts, even if such an evaluation is rooted in scientific or technical expertise, because such determinations are within the province of the jury); *Westcott v. Crinklaw*, 68 F.3d 1073, 1075 (8th Cir. 1995) (expert testimony that police officer made certain statements while suffering from post-traumatic stress disorder, which "may cause a person to make inaccurate, unreliable and incomplete statements," was excluded because it directly addressed the credibility of the officer as a witness, thus usurping the function of the jury); *United States v. Beasley*, 72 F.3d 1518, 1528 (11th Cir. 1996) ("Absent unusual circumstances, expert medical testimony concerning the truthfulness or credibility of a witness is. . . . [g]enerally inadmissible because it invades the jury's province to make credibility determinations.") (citation omitted).

█ Third, the Superior Court's prohibition on this expert opining on whether the defendant committed the crime was also patently correct, since any such testimony would invade the province of the jury and such testimony also lay outside the scope of Dr. Manion's expertise. Whether an expert is qualified to testify is addressed in Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Dr. Manion did not qualify as an expert in determining the identity of an assailant under any of the prongs of Rule 702. The examination of Dr. Manion at trial did not reveal how he was qualified to give an expert opinion as to who was the most likely perpetrator in the murder of Richardson. Instead, Dr. Manion testified that he was trained to determine cause and manner of death. (J.A. at 918.) He described cause of death as why a person died, such as did the deceased have a stroke, pneumonia,

507

ruptured artery, punctured organ, etc. (*Id.*) Dr. Manion described the manner of death as determining whether the death fell into one of five categories: natural, homicide, suicide, accidental, and undetermined. (*Id.*) Dr. Manion described that as a part of his profession he did autopsy reports, biopsies, and pathology diagnosis. (*Id.* at 914-17.) These activities involve determining the cause of death, injury, or illness based on the direct examination of a corpse. Nothing in the professional history described by Dr. Manion indicated his training or expertise in evaluating the cause of death based on the characteristics of persons other than the deceased, or determining the perpetrator of a particular crime from a group of suspects with whom Dr. Manion never had physical contact or upon whom he never conducted an exam. Dr. Manion never testified that determining the identity of a perpetrator of a crime was a common function of a forensic pathologist. Importantly, nothing in the trial record before us confirms that Dr. Manion conducted a criminal investigation into the facts and circumstances of Richardson's demise. Therefore, any testimony Dr. Manion would have provided as to the identity of Richardson's murderer was inadmissible under 702(a), (c), and (d), and inadmissible under Rule 703 for lack of a reasonable factual foundation.

The People are correct that the testimony would also fail under Rule 702(b), in that it is questionable what facts and data Dr. Manion used in arriving at his conclusion. Dr. Manion endeavored to testify as to the likely culprit in the murder of Richardson based on the physical characteristics of the persons present at the crime scene as well as each persons' relative agility and strength. At a side-bar conference, it could not be conclusively determined if and from where Dr. Manion had received information pertaining to the height and weight of D.S., Alexander, and Peets. (J.A. at 944-46.) The trial record failed to disclose the height and weight of Peets. Even if Dr. Manion were privy to this information, it is unclear as to what information he could have possibly used to determine the relative agility and strength of the suspects. It is further unclear as to what training Dr. Manion had and what methods are available that would qualify him to determine someone's strength and agility based on height and weight alone, without ever having directly examined the person or conduct any testing based upon the athleticism of any suspect in the case.

Accordingly, the trial court did not abuse its discretion in restricting Dr. Manion from testifying as to his opinion regarding the identity of the

perpetrator of Richardson's murder. Unquestionably, Dr. Manion's proposed testimony concerning the identity of Richardson's murderer exceeded his expertise and was properly foreclosed by the Superior Court.

## F. The evidence to convict was sufficient

 Alexander was convicted and sentenced for first degree murder, aggravated rape in the first degree, first degree assault, and carrying or using a dangerous weapon during the commission of a rape. On appeal, Alexander challenges the sufficiency of the evidence to convict him of these crimes. Alexander's arguments against the sufficiency of the evidence are limited to asking this Court to step into the role of the jury and find that the evidence impliedly exonerating Alexander is stronger and more credible than the evidence supporting his conviction. For instance, Alexander claims that because there was testimony that the wounds Richardson received were very painful and that it would have taken him between 15 to 40 minutes to bleed to death, this testimony invalidates the testimony of Peets who claimed that the fight between Richardson and Alexander was "silent." (Br. of Appellant at 32.) Alexander further contends that Peets' testimony had no credibility, and the People failed in proving that Alexander had the requisite malice aforethought to commit first degree murder.[8] (*Id.* at 33.) Our case law precedent repeatedly informs that we do not engage in re-evaluating the evidence or re-weighing the credibility of witnesses. The following statement expresses the approach utilized in evaluating sufficiency of the evidence claims:

> When appellants challenge the sufficiency of the evidence presented at trial, it is well established that, in a review following conviction, all issues of credibility within the province of the jury must be viewed in the light most favorable to the government. We are prohibited from weighing the evidence or determining the credibility of witnesses. And if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, we must affirm the conviction.

---

[8] Alexander also claims that the evidence is insufficient because it is based on the allegedly conflicting testimony of Peets and D.S. As we have already concluded that the jury is charged with evaluating conflicts in testimony, we shall not address this claim here.

*Williams v. People*, 56 V.I. 821, 835-36 (V.I. 2012) (internal citations and quotation marks omitted). Nonetheless, Alexander requests that this Court reweigh witness credibility and re-evaluate the evidence and find in favor of an acquittal rather than a conviction. We are not, however, charged with re-assessing the credibility of the witnesses at trial. *See United States v. Hodge*, 594 F.3d 614, 618 (8th Cir. 2010) ("A jury's credibility determinations are well-nigh unreviewable because the jury is in the best position to assess the credibility of witnesses and resolve inconsistent testimony"). Alexander is reminded that we are restricted to a review of whether there is sufficient evidence in the record, when viewed in a light most favorable to the People, for a reasonable jury to find the essential elements of the crimes and convict beyond a reasonable doubt. *Stevens v. People*, 52 V.I. 294, 304 (V.I. 2009). Here, we conclude that there is sufficient evidence.

Alexander was found guilty of and sentenced for first degree murder in violation of 14 V.I.C. § 922(a)(1) which criminalizes "[a]ll murder . . . which is perpetrated by means of poison, lying in wait, torture, detonation of a bomb or by any other kind of willful, deliberate and premeditated killing." When viewing the evidence in a light most favorable to the people, there existed enough evidence at trial to find the elements of this offense and to convict.

 The jury heard testimony that Richardson died from seven stab wounds. (J.A. at 645.) There was no evidence presented at trial that anybody, except for Alexander, possessed a knife at the murder scene. Both Peets and D.S. testified to seeing Alexander with a knife, and they both gave detailed descriptions of the knife. (J.A. at 71, 171.) Peets testified that after the fracas between Alexander and Richardson and after Alexander tossed the knife to him, he threw the knife out the window of the truck as he and Alexander drove away from the beach. (J.A. at 553.) Further, Peets testified that when he said to Alexander "you know the man dead right?" Alexander responded that he didn't realize he was stabbing Richardson so hard. (J.A. at 552.)

When Alexander was arrested the morning after the incident, he had a gash on his arm and he was in pain. (J.A. at 347-48.) When examined at the Schneider hospital, it was determined that Alexander had sustained a metacarpal fracture. (*Id.* at 434.) These injuries are consistent with involvement in a violent altercation.

 A reasonable jury could have found that Alexander possessed the requisite malice aforethought which is manifested by the evidence on

record. Although the needed *mens rea* must have occurred prior to the killing, "a brief moment of thought may be sufficient to form a fixed deliberate design to kill." *Nicholas v. People*, 56 V.I. 718, 734 (V.I. 2012) (internal quotation marks and citation omitted). It is not necessary to demonstrate that Alexander entertained and brooded over a plot to kill for any extended period of time. *See Codrington v. People*, 57 V.I. 176, 190 (V.I. 2012) (internal quotation marks omitted). The evidence informs that Richardson and Alexander engaged in a scuffle when Richardson attempted to defend D.S. from Alexander's rampage including when Richardson held Alexander by his shirt as he advanced towards D.S. The evidence further indicates that Alexander pushed Richardson to the ground and told Richardson that if Richardson touched him again he would kill him. (J.A. at 64-70.) Peets saw Richardson lying motionless on the ground shortly after the fracas Richardson had with Alexander. (*Id.*) At the crime scene, Peets remarked to Alexander "I think you kill him, 'deh man,' " and Alexander responded with indifference. (*Id.* at 70.) The evidence is sufficient for a reasonable jury to conclude that Alexander must have formed the requisite intent to kill Richardson. Richardson died from not one, but seven stab wounds inflicted upon him by Alexander which further proves that Alexander intended to kill Richardson. No self-defense or other comparable defense was raised by Alexander at trial.

■■ ■■ The evidence that Alexander raped and assaulted D.S. is overwhelming. D.S. described in graphic details the sexual assault perpetrated upon her by Alexander. D.S. described that despite her protests Richardson raped her by knife point for about an hour until she was able to escape by running and jumping into the sea. (J.A. at 171-79.) D.S. managed to swim to shore some distance away from the beach, and walk along a road until she found a house where she could ask for help. D.S.'s sole testimony, if believed by the jury, is sufficient for a jury to find Alexander guilty of aggravated rape. *See Lewis v. Gov't of the V.I.*, 77 F.Supp.2d 681, 684 (D.V.I. App. Div. 1999) (finding that the evidence was substantial enough to sustain appellant's rape conviction based on the victim's testimony despite the absence of medical evidence of forcible penetration or DNA evidence); *Watkins v. State*, 460 N.E.2d 514, 516 (Ind. 1984) ("The sole and uncorroborated testimony of the rape victim is sufficient to support the conviction.").

Therefore, even if D.S.'s testimony were uncorroborated, it would be sufficient to convict Alexander of rape. There is, however, evidence that

corroborates D.S.'s testimony at trial. Brenda Walwyn, a resident of the Mandahl area, testified that on the night of Richardson's murder D.S. came to her house naked and distraught. (J.A. at 326.) D.S. told Walwyn that she had just been raped and her friend had been murdered. (*Id.*) After Walwyn called 911, Detective Warrington Tyson arrived at Walwyn's house to find D.S. crying and in a distraught state. (*Id.* at 307.) Detective Albion George also described that on the night of Richardson's murder, D.S. was "traumatized," crying, scared, and injured all over her body. (J.A. at 371-72.) These testimonies established D.S.'s nudity and distraught physical and emotional state and are consistent with a female who had recently suffered a traumatic experience and had been raped.

Additionally, the jury heard testimony from forensic expert, Janet Wentworth, that after Wentworth conducted lab tests on vaginal swabs taken from D.S., genetic material matching Alexander's profile was present. (J.A. at 741.) Importantly, Richardson and Peets were excluded as being the source of any foreign DNA material found on D.S.'s vaginal swabs. (*Id.* at 742.)

██ D.S. testified that she was raped at knife point, and she described the knife in detail. (J.A. at 171, 175.) She suffered abrasions on her neck from having the knife against her neck, and the jury viewed pictures of these injuries. (J.A. at 194.) This testimony is sufficient to convict Alexander of carrying or using a dangerous weapon during the commission of a rape in violation of 14 V.I.C. § 2251(a)(2)(B).

██ D.S. also described the assault perpetrated upon her by Alexander as he raped her. D.S described that every time she offered some resistance to Alexander's sexual assault, Alexander would punch her repeatedly in the face. (J.A. at 175-78, 192). Walwyn described that when D.S. approached her house naked, she had a "busted lip" as well as injuries to her mouth and face area. (J.A. at 328). Photographs of D.S.'s face, which showed the various abrasions to her face as a result of the incident, were admitted into evidence. (*Id.* at 192-93.) Several police officials that responded to the 911 call that night described that D.S. had injuries all over her body. Accordingly, the evidence establishing assault is overwhelming in this case. Considering the evidence before us in a light most beneficial to the People, we find the evidence sufficient to establish all the crimes for which Alexander was convicted and sentenced.

## V. CONCLUSION

Alexander asserts a number of evidentiary errors, especially admission of the conflicting testimonies of Peets and Alexander. Alexander provides no authority that bars the admission of conflicting testimonies. Additionally, Alexander ignores the fact that conflicts in testimony must be assessed by the jury, and such assessment was obviously made in this case. Accordingly we, find that the admission of the conflicting testimonies was not erroneous, particularly when there is corroboration on important facts surrounding Richardson's murder. Although we find that the trial court erred in excluding testimony that D.S. had previously falsely accused Alexander of giving her a STD, and by admitting the irrelevant photograph of a smiling Richardson at trial, we conclude that these errors are harmless considering the overwhelming evidence presented against Alexander. We also find the trial court's *sua sponte* action in setting alibi time parameters to be harmless error, because the same information was available to Alexander in the language of the Information and in the Detective's affidavit in support of the Information.

Further, the trial court did not err in limiting the testimony of Dr. Manion, because Dr. Manion's proposed testimony exceeded the bounds of his area of expertise and was based on information not in evidence. Finally, we find that the evidence was sufficient to convict on all counts. Accordingly, the Judgment and Commitment of the trial court is AFFIRMED.